**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **WANDA WILLIAMS, individually and** | § | |
| **as Conservator for JOHN** | § | |
| **ROBERT WILLIAMS, JR.,** | § | |
| **Incapacitated,** | § | |
| | § | |
| **Plaintiffs,** | § | **Civil Action Number:** |
| | § | |
| **v.** | § | **1:14cv383 HSO-JCG** |
| | § | |
| **MANITOWOC CRANES, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

---

**THIRD AMENDED COMPLAINT**
**JURY TRIAL RESPECTFULLY DEMANDED**

---

Plaintiff, Wanda Williams, individually and as Conservator for John Robert Williams, Jr., incapacitated, files this Third Amended Complaint against Defendant Manitowoc Cranes, LLC, stating as follows:

**PARTIES**

1.     John Robert Williams, Jr., is an adult resident citizen of Mobile County, Alabama who was rendered incapacitated as a proximate result of the events described below on or about June 25, 2014.  At all times material hereto, Mr. Williams was an employee of VT Halter Marine, Inc. and was acting within the line and scope of his employment as a crane operator.

2.     Plaintiff Wanda Williams is an adult resident citizen of Mobile County, Alabama and is the wife of John Robert Williams, Jr.  Plaintiff Wanda Williams is the duly appointed guardian and conservator for John Robert Williams, Jr., incapacitated.

3.     Defendant Manitowoc Cranes, LLC, is a Wisconsin Domestic Limited Liability Corporation with its principal place of business in Manitowoc, Wisconsin. Manitowoc Cranes, LLC is wholly owned by Manitowoc Crane Group U.S. Holding, LLC, which is also the only member of Manitowoc Cranes, LLC.  Manitowoc Crane Group U.S. Holding, LLC is a Tennessee company and is wholly owned by The Manitowoc Company, Inc., which is also the only member of Manitowoc Crane Group U.S. Holding, LLC.  The Manitowoc Company, Inc. is a domestic Wisconsin Corporation with its principal place of business in Wisconsin.  The citizenship of Manitowoc Cranes, LLC is the State of Wisconsin (the State of citizenship of its member) for diversity purposes.  This Defendant may be served by process upon its registered agent, Corporation Service Company, 8040 Excelsior Drive, Suite 400, Madison, Wisconsin, 53717.   Manitowoc Crane Companies, LLC., which was named as a Defendant in the original Complaint but is not a Defendant in this Third Amended Complaint,  is also a Wisconsin Domestic Limited Liability Company with its principal place of business in Wisconsin.  Manitowoc Crane Companies, LLC is wholly owned by Manitowoc Crane Group U.S. Holding, LLC, which is also the only member of Manitowoc Cranes, LLC. Manitowoc Crane Group U.S. Holding, LLC is a Tennessee company and is wholly owned by The Manitowoc Company, Inc., which is also the only member of Manitowoc Crane Group U.S. Holding, LLC.  The citizenship of Manitowoc Crane Companies, LLC is the State of Wisconsin (the State of citizenship of its member) for diversity purposes.

**JURISDICTION**

4.      This Court has jurisdiction pursuant to 28 U.S.C.A § 1332.  The matter in controversy exceeds $75,000.00 exclusive of interest and costs and is between citizens of different states.

**FACTS**

5.      In 2004, Defendant Manitowoc Cranes, LLC (hereinafter "Manitowoc"), began designing a crawler crane that was to become the 16000 Series Crawler Crane (hereinafter "16000").

6.      At the time the 16000 was designed, Manitowoc was manufacturing multiple, different series crawler cranes, including the 2250 Series, the 777 Series, the 888 Series, the 999 Series, the 18000 Series and the 21000 Series.  All of the series crawler cranes were equipped with counterweights placed atop the upper works of the rear of each series crane.  In some models, the counterweights were secured to the crane.  In other models, the counterweights, by design, were placed on the rear of the cranes without any device or mechanism attaching the counterweights to the crane.

7.      At the time Manitowoc began designing the 16000, several series crawler cranes, including the 777, 888, 999 and 2250, utilized bolts that attached each counterweight to the counterweight below it, and attached the lowest counterweight in the stack of counterweights to the counterweight tray, which was attached to the upper works of the crane itself.  *See*, Ex. 1a, photographs of a 999 Series crane; *see also*, Ex. 1b, photographs of a 2250 Series crane.

8.      At the time Manitowoc began designing the 16000, two other series cranes, the 18000 and 21000 did not utilize bolts or pins on the counterweights on those

cranes, and there was no other mechanism utilized to attach the counterweights to the other counterweights or to attach the counterweights to the upper works of the crane itself. *See*, Ex. 2, photograph of 21000 Series crane.

9. Manitowoc decided to utilize the design of the 18000 and 21000 Series crane when it selected the counterweight design for the upper body counterweights utilized on the 16000. *See*, Ex. 3, photograph of 16000 Series crane. Manitowoc used the exact same design for the upper works counterweights it utilized on the 18000 and 21000 Series crawler cranes. The counterweights on all three series are identified with the same part number.[1]

10. At the time it designed the 16000, Manitowoc knew that all cranes, including its cranes, "get light," a phenomenon that occurs when the crane tips forward towards the boom and cab of the crane. The very purpose of the counterweights is to keep a crane from "getting light," tipping forward or tipping over. When it designed the 16000, Manitowoc knew its crawler cranes, could, and would, "get light," tip forward and tip over during operation. Further, Manitowoc knew that unsecured counterweights could slide forward off of the counterweight tray, thereby causing a crane to suffer a catastrophic tip over, as opposed to just "getting light." Manitowoc knew that the 16000 would be used in "tandem lifts," a process in which two or more cranes work together to lift a load. At no time has Manitowoc placed warnings on the 16000 crane, in the cab, or

---

[1] Some of the information in this Third Amended Complaint has been designated "confidential." The parties have conferred and reached an agreement that allows documents and depositions designated as "confidential" to be filed publicly through the CM/ECF system after the documents have been approved by the opposing party. The parties agree that filing the confidential documents with this approval does not waive the confidential designation of this or any other document.

in any of the crane's manuals to warn operators the counterweights could fall off of the counterweight tray, or that the counterweights could strike the crane cab.

11.     At the time it designed the 16000, Manitowoc did not undertake any steps to ensure that the upper works counterweights would remain attached to the crane in the event the crane "gets light," tips forward or tips over.  From the time it first designed the 16000, Manitowoc has done no testing on the 16000, 18000 or 21000 Series crawler crane to determine whether it could secure the upper works counterweights to the crane in the event the crane "gets light," tips forward or tips over.

12.     As of 2008, Manitowoc possessed the ability to issue recalls, warnings, and "Product Improvement Programs" ("PIP") to the end users of its cranes.  These PIPs have been utilized by Manitowoc to warn owners and operators of its cranes of dangers associated with the operation of its cranes of which Manitowoc has become aware.

13.     In 2008, in Platte County, Missouri, a crane operator was booming down an 18000 Series Manitowoc crawler crane, when that crane "got light" and, ultimately, tipped over.  As a result of the 18000 Series crane tipping forward, the upper works counterweights slid forward (toward the boom and cab) off of the counterweight tray, and one or more counterweights struck the cab, dislodging it from the crane.  *See*, Ex. 4, photographs of the Platte County, Missouri, incident.  The 18000 Series Manitowoc Crane utilized the same upper works counterweight design as the 16000 and 21000 Series cranes.

14.     Manitowoc was made aware of this incident, and knew from its investigation that the counterweights fell forward toward the cab as the crane "got light" and tipped forward.  At no time has Manitowoc issued any product recall, warning, or

PIP designed to inform owners and operators of the 16000, 18000 or 21000 Series crawler crane that the counterweights can slide off of the counterweight tray into the cab in the event the crane "gets light," tips forward or tips over.

15.    In September 2009, in Cohocton, New York, a crane operator was lowering the boom (a process known as "booming down") on a 16000 after using that crane to perform work on a wind-turbine.  As that 16000 was booming down, the crane "got light."  The crane began tipping forward, and the upper works counterweights behind the cab slid forward and into the cab.  *See*, Ex. 5, photographs of the Cohocton, New York, incident.  The counterweights struck with such force to dislodge the cab from the crane.  The force of the impact between the counterweight and the cab caused the crane's operator to suffer serious injuries.

16.    Manitowoc was made aware of this incident in New York, and it knew from its investigation that the counterweights fell forward into the cab as the crane tipped forward.  *See*, Ex. 6a, New York Incident Report; *see also*, Ex. 6b, New York Incident Field Inspection Report.  Manitowoc issued no product recall, warning, or PIP to inform operators of the 16000, 18000, or 21000 Series crawler crane that the counterweights can slide off of the counterweight tray into the cab in the event the crane "gets light," tips forward, or tips over.  Manitowoc conducted no testing to determine whether any system can be utilized to keep the counterweights secured to the crane in the event a crane "gets light," tips forward, or tips over.

17.    In 2010, VT Halter Marine, Inc. (hereinafter "VTHM"), contracted with H&E Equipment Services (hereinafter "H&E") to purchase two Manitowoc 2010 model 16000 Series cranes.  Manitowoc manufactured, sold (through H&E) and delivered to

VTHM the first 16000 it ordered, serial number 16001132. Crane 16001132 was the crane John Robert Williams, Jr. was operating at the time of the incident made the basis of this civil action ("hereinafter, "Williams crane").

18.     VTHM ordered a seventy-foot fixed jib to attach to the William's crane's boom. Manitowoc designed and manufactured the jib then separately delivered it to VTHM so that it could be affixed to the Williams crane. Once Manitowoc attached the jib, the company designed the computer software necessary for the crane's computer to utilize the jib. Manitowoc uploaded the software to the Williams crane.

19.     Later in 2010, Manitowoc manufactured, sold (also through H&E) and delivered a second 16000 to VTHM, serial number 16001137. Crane 16001137 was also being used at the time of the incident, and was being operated by a VTHM employee, David Smith. When each 16000 crane was delivered, Manitowoc's agents, servants and/or employees were at VTHM supervising and/or directing the assembly of each crane.

20.     In 2012, Manitowoc opened a state-of-the-art testing facility in Shady Grove, Pennsylvania known as Manitowoc's "Product Verification Center."

21.     In 2012, the Product Verification Center began testing the performance of Manitowoc cranes as well as the performance of the components that comprise its cranes. The Product Verification Center employs approximately forty-one managers, engineers and technicians who perform the testing of the cranes and components. At its Product Verification Center, Manitowoc creates internal standards that Manitowoc uses for its cranes and components. At no point from the time the Product Verification Center was opened has Manitowoc tested any of its crawler cranes, including the 16000, to determine

whether it was feasible to secure counterweights to the crane to prevent the counterweights from falling off of the counterweight tray in the event that a crane "got light," tipped forward, or tipped over.

22.     At no time has Manitowoc tested the 777, 888, 999, or 2250 Series crawler crane to determine if the bolt mechanism it uses to secure the counterweights to these series cranes would prevent the counterweights from sliding off the counterweight tray and into the cab in the event a crane "got light," tipped forward or tipped over.

23.     On April 5, 2014, a crane operator near Detroit, Michigan was operating a 16000 when that crane tipped forward toward the boom and cab. As the crane tipped forward, one or more of the upper works counterweights fell forward and into the cab. The force of the impact completely dislodged the cab from the crane. *See*, Ex. 7, photographs of the Michigan incident. The operator was ejected from the cab and died. Manitowoc was made aware of this incident, and it knew from its investigation that the counterweights fell forward into the cab as the crane tipped forward. *See*, Ex. 8, Michigan Incident Report. Manitowoc issued no product recall, warning, or PIP designed to warn operators of the 16000, 18000, or 21000 Series crawler crane the counterweights can slide off of the counterweight tray into the cab in the event the crane "gets light," tips forward, or tips over. At no point has Manitowoc conducted any testing to develop a system to secure the counterweights to the crane in the event the crane "got light," tipped forward, or tipped over.

24.     On May 27, 2014, after the incident near Detroit, a local union official wrote a letter to Manitowoc expressing concern that there was no strap or other mechanism being used to attach the counterweights to the 16000 Series crane. *See*, Ex. 9,

Union Letter.  The union official asked Manitowoc to address this issue immediately as the union official and other members of the union were concerned that other operators could be injured of killed from falling counterweights.  The union official offered to assist Manitowoc with alternative designs and offered to share alternative retrofit methods used by some operators to attach the counterweights to the crane.  Manitowoc did not respond to this letter, did not perform any testing to determine whether it would be feasible to secure the upper works counterweights to the 16000 crane, or work in any way with the union official to address the union's concerns.

25.     On Monday, June 23, 2014, John Robert Williams "boomed down" crane 16001132 so that VTHM personnel could inspect it after the crane was struck by lightning.

26.     While the crane was "boomed down," VTHM personnel replaced the load cell on the crane's main hoist line.  The load cell is a sensor that tells the crane's computer how much weight is being picked up during a lift.  After the load cell was replaced, Williams began raising the crane's boom, a process known as "booming up."  When the boom reached an angle of approximately 58.4 degrees, Williams activated drum 1-1 on the crane's computer system.  Drum 1-1 is the crane's main-line hoisting drum and operates the crane's main hoist line.  Although drum 1-1 had been "inactive" on the crane's computer, the 16000 was designed so that the operator could use the drum (and thus, lift a load) even while the drum was "deactivated" on the crane's computer system.

27.     For approximately the next hour, John Robert Williams attempted to configure the Williams crane's computer so that he could utilize the crane's Rated

Capacity Indicator/Rated Capacity Limiter ("RCI/RCL") (also, generically known in the industry as a Load Moment Indicator or "LMI") for the main hoist line. The crane's data logger shows that the load cell was working properly, but the Williams crane's computer was improperly sending error messages to Williams in the cab that the crane was over capacity when it was not and was not allowing Williams to utilize crane operations that were being automatically shut down by the faulty crane computer. There is no evidence that the lightning strike had any effect on the Williams crane's computer system or had any effect on the error messages the computer system was improperly sending to Williams. After Williams made repeated attempts to use the RCI/RCL computer system for drum 1-1, and Williams received multiple error messages resulting in the crane repeatedly, improperly, prohibiting operation, Williams deactivated drum 1-1 on the afternoon of Monday, June 23, 2014. Williams was unable to utilize the Williams crane's RCI/RCL for drum 1-1 due to the computer malfunction from the afternoon of June 23, 2014 through the incident made the basis of this civil action.

28. On June 25, 2014, Dillon Breland, a VTHM employee, used a "transporter" to move a bow module of a Hornbeck vessel that VTHM was building from Plat 5 on the yard to the area where the vessel was being constructed. The bow module weighed approximately 500,000 pounds.

29. VTHM needed to perform a "tandem lift" to lift the bow module from the transporter, flip it over (the bow module was constructed upside down), and position it so that it could be attached to the Hornbeck vessel's hull being constructed. After the bow module was moved to the area where the vessel was located on the yard, the riggers, flaggers, crane operators and other personnel met to discuss the lift.

30.     The VTHM employees then rigged the lines from three cranes, the two Manitowoc 16000 series cranes and a SANY crawler crane operated by Harold Abbot, to the bow module.  Julius Williams, the rigging foreman at VTHM, told the VTHM personnel the weight of the bow module, and the three cranes lifted the bow module in unison.  Breland then moved the transporter to the northern end of the yard, out of the way.  Abbot "tailed the bow module down," and his rigging was disconnected from the bow module.  Abbot then repositioned his crane on the east side of the Subject Crane and watched as the two Manitowoc cranes moved the bow module southward towards the Hornbeck vessel hull.

31.     As the two 16000 Series cranes traveled southward, the flaggers gave a command for the crane operators to stop moving.  Williams stopped moving, but the southern 16000 operated by Smith did not.  As Smith continued to travel away from the stationary Williams crane, the Williams crane's rear tracks slowly began to lift off of the ground, a process known as "getting light."  The Smith crane stopped moving, but the Williams crane continued to tip forward.

32.     Even after crane 16001137 stopped moving, the Williams crane continued to tip forward.  Once the Williams crane began tipping forward, Williams began to lower the load (a process known as "hoisting down") and to raise the boom – the proper procedures for a crane operator to follow in this situation.  Despite Williams's attempts to stop the crane from tipping, he was unsuccessful.  Julius Williams looked at the cab while the Williams Crane was tipping forward, but before any counterweights struck it, and saw Plaintiff John Williams furiously trying to work the controls of the crane in an attempt to keep the crane from tipping over.

33.     As the Williams crane continued tipping forward, Abbot jumped down from his crane and saw a counterweight from the Williams crane fall forward into the Williams crane's cab causing the cab to "disappear" under the crane.  Breland ran when the Williams crane started tipping forward.  When he turned around, he clearly saw counterweights "raining down" on the Williams crane's cab slinging the cab underneath the crane.  Horne prayed as he watched the counterweights falling "like bowling balls" as the crane continued to tip forward.  *See*, Ex. 10, photographs of the Williams crane after the crane tipped over.

34.     The force of the impact from one or more counterweights striking the rear of the Williams crane's cab was with such force that it detached the cab from the crane body and ejected Williams from the cab causing him catastrophic permanent injuries.

35.     At the time of the above-described incident, the Williams crane was in substantially the same condition as it was when it was designed, manufactured, and placed in the stream of commerce by Manitowoc and distributed by H&E.

**FIRST CAUSE OF ACTION**
**DEFECTIVE PRODUCT – DESIGN DEFECT**

36.     Plaintiff reasserts the allegations contained in paragraphs 1-35 above and incorporates the same by reference herein.

37.     This cause of action is in accordance with § 11-1-63 MCA and the common law of the state of Mississippi.

38.     Plaintiff alleges that at the time of the incident made the basis of this action, the Williams crane was in substantially the same condition as when Manitowoc originally designed, manufactured, sold, and distributed it.

39.     Plaintiff further alleges that the Williams crane was in a defective and unreasonably dangerous condition at the time of its original design, manufacture, sale and delivery by Manitowoc because the Williams crane lacked a device, guard, restraint, bolt, chain, or mechanism that prohibited and prevented the counterweights from striking the cab of the Williams crane when the crane "got light," tipped forward, or tipped over. When the Williams crane was designed, manufactured, sold and delivered, it was foreseeable or should have been foreseeable to Manitowoc that the counterweights would strike the cab of the crane if the crane "got light," tipped forward, or tipped over during a lift.

40.     Plaintiff further alleges that the Williams crane was in a defective and unreasonably dangerous condition at the time of its original design, manufacture, sale and delivery by Manitowoc because the Williams crane lacked a device, sensor or other mechanism to monitor the angle of the hoist line holding the load, especially during "tandem lifts."   When the Williams crane was designed, manufactured, sold and delivered, it was foreseeable or should have been foreseeable to Manitowoc that the Williams crane would be involved in "tandem lifts," and that there was a foreseeable risk that one crane could pull another crane over during such a lift.

41.     Plaintiff further alleges that the Williams crane was in a defective and unreasonably dangerous condition at the time of its original design, manufacture, sale and delivery by Manitowoc because the Williams crane's computer was malfunctioning and improperly shutting down the crane after the load cell was replaced on June 23, 2014. The Williams crane computer's malfunction prevented Williams from being able to utilize the crane's RCI/RCL and deprived Williams, and the other VTHM employees, of

important information during the lift made the basis of this civil action. When the Williams crane was designed, manufactured, sold and delivered, it was foreseeable or should have been foreseeable to Manitowoc that the Williams crane would be involved in "tandem lifts," and that there was a foreseeable risk that one crane could pull another crane over during such a lift, necessitating the need for a properly functioning computer system on the Williams crane.

42.     Plaintiff further alleges that the Williams crane was in a defective and unreasonably dangerous condition at the time of its original design, manufacture, sale and delivery by Manitowoc because Manitowoc did not provide a load chart to VTHM or Williams that had the actual capacity of the crane listed while configured with a 70-foot fixed jib yet the operator lifted with the main hoist line. Manitowoc's failure to provide a load chart with the deductions accounted for on the load chart itself, when coupled with the faulty computer system described above, prevented Williams from knowing the actual capacity of the crane without doing mathematical calculations by hand. When the Williams crane was designed, manufactured, sold and delivered, it was foreseeable or should have been foreseeable to Manitowoc that the Williams crane required a load chart that displayed the actual capacity of the crane, with a 70-foot fixed jib attached to the end of the boom, without requiring the operator to do mathematical calculations to determine the capacity.

43.     Plaintiff further alleges that the Williams crane was in a defective and unreasonably dangerous condition at the time of its original design, manufacture, sale and delivery by Manitowoc because the Williams crane and operator manual lacked a warning or advisory that the upper works counterweights could and would fall off of the

counterweight tray and into the cab in the event the cab "got light," tipped forward, or tipped over, or that other 16000 Series cranes catastrophically failed in that way. When the Williams crane was designed, manufactured, sold and delivered, it was foreseeable or should have been foreseeable to Manitowoc that the counterweights could and would fall off of the counterweight tray on the 16000 when the crane "got light," tipped forward, or tipped over, yet it did not warn the owner, operator, and/or end user of this danger.

44.     Plaintiff further alleges that the Williams crane was in a defective and unreasonably dangerous condition at the time of its original design, manufacture, sale and delivery by Manitowoc because the Williams crane's computer allowed the operation of a drum (such as drum 1-1) even while the computer listed that drum as "inactive" or the drum and/or line was not functioning properly. When the Williams crane was designed, manufactured, sold and delivered, it was foreseeable or should have been foreseeable to Manitowoc that a drum or line could malfunction, yet it programmed the computer to allow an operator to use a drum and/or line, even while that drum was deemed "inactive" on the crane's computer.

45.     Plaintiff further alleges that the Williams crane was in a defective and unreasonably dangerous condition at the time of its original design, manufacture, sale and delivery by Manitowoc because approximately 1% of the 16000 Series cranes manufactured had catastrophically failed resulting in the crane tipping forward and counterweights falling forward into the cab causing the operator serious injury. Further, before the incident made the basis of this action, approximately 2% of the 16000 Series cranes manufactured had catastrophically failed, but Manitowoc did nothing to fix the cranes' unreasonably dangerous condition or warn operators of the dangers or other

catastrophic failures. When the Williams crane was designed, manufactured, sold and delivered, it was foreseeable or should have been foreseeable to Manitowoc that the crane could and would catastrophically fail when the crane "got light," tipped forward, or tipped over, yet it did not warn the owner, operator, and/or end user of this danger or of the other incidents.

46. Manitowoc knew, or in the exercise of reasonable care or reasonably available knowledge, should have known, about the unreasonably dangerous condition presented by a crane that lacked a device, guard, restraint, chain, bolt or mechanism to secure the counterweights to the crane and prevent the counterweights from striking the cab if the crane "got light," tipped forward, or tipped over.

47. Manitowoc knew, or in the exercise of reasonable care or reasonably available knowledge, should have known, about the unreasonably dangerous condition presented by a crane that lacked a a sensor or other device to monitor the angle of the hoist line, especially during "tandem lifts." Manitowoc created an unreasonably dangerous condition because it designed the 16000 to utilize men on the ground during a "tandem lift" to monitor the angle of the hoist line carrying the load with only the naked eye.

48. Manitowoc knew, or in the exercise of reasonable care or reasonably available knowledge, should have known, about the unreasonably dangerous condition presented by a crane that lacked a properly functioning computer, especially the RCI/RCL, especially during "tandem lifts."

49. Manitowoc knew, or in the exercise of reasonable care or reasonably available knowledge, should have known, about the unreasonably dangerous condition

presented by a crane that lacked a load chart listing the actual capacity of the crane with a fixed 70-foot jib attached to the end of the boom without requiring the operator to perform mathematical calculations by hand to determine the actual capacity of the crane in the event the computer malfunctioned.

50.     Manitowoc knew, or in the exercise of reasonable care or reasonably available knowledge, should have known, about the danger associated with allowing the operator to use a drum and/or line to perform a lift while that drum is selected as "inactive" on the crane's computer or is otherwise not displaying accurate information due to computer defect.

51.     Manitowoc knew, or in the exercise of reasonable care or reasonably available knowledge, should have known, about the unreasonably dangerous condition presented by the 16000 "getting light," tipping forward, or tipping over, yet it took no steps to warn its owners and/or operators of the dangers or of the prior incidents involving 16000 Series cranes that tipped forward resulting in the counterweights striking the cab.

52.     The Williams crane failed to perform as expected because the crane lacked a device, guard, restraint, chain, bolt or mechanism to secure the counterweights to the crane and/or to prevent the counterweights from striking the cab.   This condition presented an extreme danger to the crane operator of being injured or killed if the crane "got light," tipped forward or tipped over causing the crane cab to be struck by unrestrained counterweights.

53.     The Williams crane failed to perform as expected because the crane lacked a device, sensor, or other mechanism to measure the angle of the hoist line holding the

load, especially during "tandem lifts." This condition presented an extreme danger to the crane operator of being pulled forward to the point that his crane tipped over, which could cause him injury or death.

54.     The Williams crane failed to function as expected because it tipped forward and the counterweights struck the cab.  There existed feasible design alternatives that would have, to a reasonable probability, prevented the injury to Mr. Williams.  The feasible design alternatives include, without limitation, mechanisms to secure the counterweights to the crane such as bolts, pins, chains, and vertical counterweight trays that are in use in the industry.

55.     The Williams crane failed to function as expected because it was allowed to have its load pulled away from it by crane 16001137 during the lift made the basis of this civil action.  There existed feasible design alternatives that would have, to a reasonable probability, prevented injury to Mr. Williams by keeping the crane from tipping over.  The feasible design alternatives include, without limitation, a sensor or other device to measure the angle of the hoist line while lifting a load (including "tandem lifts") that would convey the hoist line angle to the operator and disable the cranes in the event the crane's hoist line exceeded its capacity.

56.     The Williams crane failed to function as expected because it was not equipped with a load chart that listed the actual capacity of the crane while affixed with a 70-foot fixed jib yet lifting with the main boom hoist line, that did not require the operator to perform manual mathematical calculations to determine the crane's actual lifting capacity in the event the crane's RCI/RCL were not functioning properly.  There existed feasible design alternatives that would have, to a reasonable probability,

prevented the injury to Mr. Williams. The feasible design alternatives include, without limitation, load charts that list the actual capacity for a crane lifting with the main boom hoist line but affixed with a 70-foot fixed jib attached to the end of the boom that are in use in the industry.

57.     The Williams crane failed to function as expected because it's computer was programmed to allow the operator to lift with a drum and/or hoist line that was selected as "inactive" on the crane's computer and/or to allow the operator to use that drum and/or hoist line while components on that drum and/or hoist line were broken or missing. There existed feasible design alternatives that would have, to a reasonable probability, prevented the injury to Mr. Williams. The feasible design alternatives include, without limitation, a computer program to limit the use of "inactive" drums and/or hoist lines, and/or drum and/or hoist line while components on that drum and/or hoist line were broken or missing, that are in use in the industry.

58.     Plaintiff further alleges that Defendant Manitowoc was at all material times in the regular business of designing, manufacturing, selling and supplying cranes of the same type and kind as subject of this civil action.


## SECOND CAUSE OF ACTION
## DEFECTIVE PRODUCT AND NEGLIGENCE

59.     Plaintiff reasserts the allegations contained in paragraphs 1-35 above and incorporates the same by reference herein.

60.     This cause of action is brought pursuant to § 11-1-63 MCA (2003), and the common law of the state Mississippi.

61. As a manufacturer of cranes used in industrial settings, including VTHM, Manitowoc had a duty to John Robert Williams, Jr., under the common law under § 11-1-63 MCA (2003), in the design, manufacture, sale and distribution of the Williams crane.

62. Manitowoc breached those duties in one or more of the following respects:

    a.    Designing, manufacturing, assembling, and/or selling the Williams crane involved in the incident made the basis of this civil action in a defective and/or unreasonably dangerous condition;

    b.    Failing to design the subject Manitowoc crane with appropriate devices, guards, restraints, chains, bolts and/or mechanisms to secure the counterweights to the crane that prohibited and/or prevented the counterweights from falling off and/or striking the cab of the Williams crane;

    c.    Failing to inspect the subject Manitowoc crane when a proper inspection would reveal the absence of safety devices, guards, restraints, and/or mechanisms to secure the counterweights that prohibited and/or prevented the counterweights from falling off and/or striking the cab of the subject crane;

    d.    Failing to train, instruct and/or warn end users, including John Robert Williams, Jr., of the danger posed by the counterweight system on the subject Manitowoc crane;

    e.    Failing to adequately warn end users, including John Robert Williams, Jr., of the Williams crane as to recognized and/or foreseeable hazards or dangers associated with the use of the Williams crane and in particular its upper works counterweight system;

    f.    Failing to adequately warn end users, including John Robert Williams, Jr., of the past tip overs of Manitowoc cranes and that the counterweights on those cranes fell into the cabs of the respective cranes;

    g.    Failing to ensure that the subject Manitowoc crane was reasonably safe for the foreseeable uses to which it would be placed, specifically including "tandem lifts;"

h.      Causing or allowing a defective and unreasonably dangerous condition to persist despite the fact that Manitowoc knew or should have known that there was nothing preventing the counterweights from falling off and/or striking the cab in the event the crane "got light," tipped forward, or tipped over during a lift;

i.      Exposing John Robert Williams, Jr. to a dangerous condition the Defendants created and/or allowed to persist; and

j.      Failing to equip the Williams crane with a device, sensor or other mechanism to measure the angle of the hoist line during a lift including, but not limited to a "tandem lift;"

k.      Failing to equip the Williams crane with a computer system that would allow Williams to monitor the load he was lifting during a tandem lift and not improperly disable the crane;

l.      Failing to take appropriate action to act on and correct a hazardous condition of unsecured counterweights falling into the cab and dislodging it from the crane, despite three prior tip overs involving 1 18000 and 2 16000 Series cranes;

m.      Failing to issue a PIP, warning, or recall for the 16000 despite three prior tip over involving 1 18000 Series crane, 2 16000 Series cranes, and being asked by a union official in Michigan to take immediate action to cure this unreasonably dangerous condition;

n.      Failing to provide a load chart that accurately showed the Williams crane's actual lifting capacity while affixed with a 70-foot fixed jib;

o.      Allowing the operator to lift a load with a drum and/or hoist line while that drum was listed as "inactive" on the crane's computer and/or while that drum and/or hoist line had faulty, broken, or missing components; and

p.      Causing John Robert Williams, Jr.'s injuries.

**DAMAGES**

63.     As a proximate consequence of the acts and omissions as described above, John Robert Williams, Jr., was caused to suffer the following catastrophic injuries and damages: he has suffered a traumatic brain injury; a crush injury to his skull from the frontal skull to the parietal skull; he was caused to undergo a craniectomy and a cranioplasty due to the severity of the crush injury to his skull; he was caused to undergo the insertion of a plate in his skull that was surgically placed there to address the crush injury to his skull; he was caused to undergo the removal of that skull plate due to complications from the procedure; his right eye was caused to be removed from the orbital socket as a result of the physical trauma from this incident and he has been rendered blind in both eyes; he has suffered a substantial altering of his mental status and cognitive function; he now needs twenty-four hour assistance with basic human functions, including feeding himself, grooming and bathing; he suffered an injury to his right hip that will most likely cause him to need a full hip replacement, as well as other serious and catastrophic bodily injuries; he has been caused to undergo medical treatment and procedures for his injuries and will be caused to undergo further such treatment and procedures in the future; he was caused to be transferred to the Shepherd Center, a facility in Atlanta, Georgia that specializes in the treatment of persons, who like John Robert Williams, Jr., who have suffered catastrophic injuries; he was permanently and irreparably injured; he has been caused to incur medical, hospital, drug, therapy and rehabilitation expenses and will be caused to incur such expenses in the future; he has suffered, still suffers and will continue to suffer in the future physical pain, suffering, mental distress and emotional anguish; he has lost the ability to work, has suffered lost

wages, has suffered lost earning capacity and will so suffer in the future; and his injuries have caused him to be deprived of enjoyment of his life and will so deprive him in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant Manitowoc Cranes, LLC, for compensatory damages in excess of the jurisdictional threshold of this Court, and all costs of this civil action.

## THIRD CAUSE OF ACTION
## LOSS OF CONSORTIUM

64.     Plaintiffs reassert the allegations contained in paragraphs 1-63 above and incorporate the same by reference herein.

65.     At the time of the incident made the basis of this action, Plaintiff Wanda Williams was lawfully married to John Robert Williams, Jr.  As a proximate result of the allegations listed above, Wanda Williams was caused to lose the society, services and consortium of her husband in the past, present and will continue in the future.

WHEREFORE, Plaintiff Wanda Williams, individually, demands judgment for compensatory damages against Defendant Manitowoc Cranes, LLC, in excess of the jurisdictional limits of this Court, and all costs of this civil action.


PLAINTIFF SPECIFICALLY DEMANDS TRIAL BY JURY.

Respectfully submitted on June 16, 2015.

TOBIAS, McCORMICK & COMER, LLC
Attorneys for Plaintiffs

   /s  Bryan E. Comer
Bryan E. Comer
MSB#:  (PHV)
1203 Dauphin Street
Mobile, Alabama 36604
Phone:  251-432-5001
Facsimile:  251-432-0714
bryan@tmclawyers.com

OF COUNSEL FOR
PLAINTIFFS

Ben F. Galloway, III
MSB # 4390
OWEN, GALLOWAY & MYERS, PLLC
P. O. Drawer 420
Gulfport, MS 39502-0420
Phone: 228-265-5109
Facsimile: 228-868-2813
bfg@owen-galloway.com

Desmond V. Tobias
Jason S. McCormick
Bryan E. Comer
Tobias, McCormick & Comer, LLC
1203 Dauphin Street
Mobile, AL 36604
Phone:  251-432-5001
Facsimile:  251-432-0714
desi@tmclawyers.com
jason@tmclawyers.com
bryan@tmclawyers.com

Clay Rankin, III.
Rankin Law, LLC
311 Magnolia Avenue
Fairhope, AL 36532
Phone:  251-509-2050
Facsimile:  251-990-4069
Clay.Rankin@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 16th day of June, 2015, I filed the foregoing document with CM/ECF, which will send notice to:

J. Chase Bryan, Esq.
Walter H. Boone, Esq.
Mandie B. Robinson, Esq.
Thomas P. Watson, Esq.
Forman Watkins Krutz & Tardy LLP
200 South Lamar Street
City Centre Building, Suite 100
Post Office Box 22608
Jackson, MS  39225-2608
jcbryan@fpwk.com
whboone@fpwk.com
robinsonab@fpwk.com
watsontp@fpwk.com

*/s  Bryan E. Comer*