## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

**WANDA WILLIAMS, individually and
as temporary guardian and temporary
conservator for JOHN ROBERT
WILLIAMS, JR., incapacitated,**                                    **PLAINTIFFS**

**VS.**                                    **CIVIL ACTION NO. 1:14-CV-383 HSO-JCG**

**MANITOWOC CRANES, LLC; and
CAIRO MARINE SERVICE, INC.**                                    **DEFENDANTS**

### MEMORANDUM OF LAW
### OF DEFENDANT MANITOWOC CRANES, LLC
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Manitowoc Cranes, LLC ("Manitowoc") submits this Memorandum of Law in Support of its Motion for Summary Judgment, and in support would show the following:

### INTRODUCTION

This unfortunate case arises from a multi-crane accident that was clearly preventable if only the crane operators and their employer had followed Federal OSHA regulations, industry standards, safe work practices and the operating instructions provided by the cranes' manufacturers. The case involves a crane tipover at the V.T. Halter shipyard in Pascagoula, Mississippi and involved a Manitowoc Model 16000 crane ("Model 16000"). The tipover occurred while John Williams was using the Model 16000 crane to perform a joint tandem lift, called a critical lift,[1] with another Model 16000 crane. The two cranes were transporting a large ship hull from one area of the shipyard to another.

The weight of the ship hull when distributed between the two cranes required both cranes to operate near maximum capacity (something which is not permissible in a critical lift such as

---

[1] The term critical lift has been defined by industry standards as a lift which meets one of many criteria including where the lifting operation involves more than one crane lifting a common load. Critical lifts, because of their complexity and danger, require heightened care, planning, authorization, communication and execution.

this).  As the cranes both independently moved to perform this critical lift, the operator of the second crane (also a Model 16000) opposite of Mr. Williams' crane began to travel his crane faster than Mr. Williams' crane.  This caused the ship hull to be pulled away from Mr. Williams' crane, and created an unequal distribution of the load between the two cranes.  At the same time this occurred, Mr. Williams was traveling his crane over an incline that exceeded the 1% operating grade restriction for the Model 16000.

VT Halter's critical lift of this ship hull was performed without a requisite lift plan.  It was also performed without proper communication protocols being established (which would have positioned spotters to notify the operators of any deviation in the distance between the two cranes).  Moreover, it was undertaken without the crane being in proper working condition (something which both VT Halter and Mr. Williams knew prior to beginning this critical lift).  Additionally, Mr. Williams chose not to use several of the crane's operator aids that were available and which would have provided him information about the lift (if his crane had been in proper working condition and he had properly programmed the crane's onboard computer).

As a result, both VT Halter and Mr. Williams clearly (and willfully) violated (1) Federal OSHA regulations, (2) industry standards, (3) safe work practices and (4) the crane's operating instructions provided by Manitowoc.  Sadly, these multiple violations lead to Mr. Williams' crane to be pulled over during this critical lift when the ship hull being lifted was pulled too far away from his crane that it exceeded his crane's operating capacity.  These multiple violations also created a chain reaction in which both cranes being used for this critical lift were toppled to the ground.

### A.  Plaintiff Has Alleged Two General Claims: Design Defect And Failure To Warn.

In the Third Amended Complaint, Williams asserts numerous claims under the Mississippi Products Liability Act ("MPLA"), MISS. CODE ANN. § 11-1-63, and common law[2] against Manitowoc.  Those claims fall generally into two different categories: design defect claims and a failure to warn claim.

Design Defect Claims

Plaintiff claims that the Model 16000 was defective and unreasonably dangerous in two ways.

First, Plaintiff claims that the counterweights on the Manitowoc 16000 should have been equipped with a counterweight restraint mechanism which would have completely restrained the counterweights in the event of a catastrophic tipover and prevented them from striking the cab. (Third Amended Complaint, ¶¶ 39, 62(b), (c), (h)).[3]   There are three different counterweight restraint mechanisms proposed by Plaintiff's experts: chain, cable or strap restraint mechanism in which chains, cables or straps are applied to secure the counterweight stacks, pin and lug restraint mechanism in which the counterweights are secured to one another and to the crane body with steel pins, and a counterweight barrier which allegedly prevents falling counterweights from impacting the cab during a forward tipover.

Second, Plaintiff alleges that the crane should have had a cable angle warning system in place which would have detected when the cable reached an excessive threshold angle, and

---

[2]  Williams asserts various negligence claims based on the manufacture, design, and warnings associated with the Manitowoc 16000. (Third Amended Complaint, Dkt # 118, ¶  62). These negligence claims are subsumed by the MPLA and do not constitute separate causes of action under Mississippi common law.   *See Little v. Smith & Nephew, Inc.*, 2015 U.S. Dist. LEXIS 75666, 13-14 (N.D. Miss. June 11, 2015) (finding that after the March 17, 2014 amendments to the MPLA, "negligence claim[s] premised on design defect, manufacturing defect, and failure to warn are subsumed by the MPLA and cannot exist as a stand-alone negligence claim."); *see also Scirocco v. Ford Motor Co.*, 2015 U.S. Dist. LEXIS 66561, 2-3 (S.D. Miss. May 21, 2015).

[3]  The Third Amended Complaint specifies that the counterweight restraint design defect claims includes Williams' supposed feasible design alternatives of strap, chain, pin and lug, and barrier restraints.  For simplicity, all of these alleged alternatives are included within the general category of counterweight restraints.

somehow prevented Mr. Williams' crane from being tipped over.  (Third Amended Complaint, ¶ ¶ 40, 62(g), (j)).

<u>Failure to Warn Claims</u>

Finally, Plaintiff also claims that Manitowoc's failure to warn was a violation of the MPLA.

**B.  Manitowoc is Entitled to Summary Judgment for Three Reasons**

Manitowoc is entitled to summary judgment on Plaintiff's claims for three reasons.  First, as more fully outlined in two separate Motions to Exclude Expert Testimony that are being filed concurrently with this brief, Plaintiff has failed to offer reliable evidence of a design defect. Plaintiff has tendered three liability experts to meet her burden of establishing a design defect: Drs. William Singhose, Joshua Vaughan, and Khalid Sorensen.  All three of Plaintiff's liability experts failed to establish that an alternative design exists.  Their proposed alternatives come woefully short of the requirements established by the MPLA.  Plaintiff's experts have offered only "conceptualized possibilities," have failed to provide "specific information" or "specific design" regarding their alternatives, and have not exercised "professional rigor" in the assessment of their alternatives.  Further, their methodology and reliance on a 1:50 scale die cast toy model crane to support their opinions is unreliable under *Daubert.*  Plaintiff's claims require expert testimony to prove that a defect exists and that there is a feasible alternative design that could cure the defect.  *See* MISS. CODE ANN. § 11-1-62; *Previto v. Ryobi N. Am., Inc.*, 2011 U.S. Dist. LEXIS 3853, 21 (S.D. Miss. Jan. 14, 2011) (quoting *McIntosh v. Nissan North America, Inc.*, 2008 U.S. Dist. LEXIS 91972, 2008 WL 4793743, at *3 (S.D. Miss. Oct. 28, 2008)); *see also Scirocco v. Ford Motor Co.*, 2015 U.S. Dist. LEXIS 66561, 7 (S.D. Miss. May 21, 2015) ("Mississippi's federal courts have consistently held that plaintiffs cannot prove the existence of

a product defect without expert testimony."). Plaintiff's claims herein cannot proceed with expert testimony.

Second, Plaintiff has also failed to prove that the alternative concepts about which Plaintiff's proffered liability experts theorize would actually prevent the type of accident at issue herein. *See* MISS. CODE ANN. § 11-1-62(f)(ii). Plaintiff's proffered liability experts have not offered reliable testimony or performed reliable testing which proves the harm, that only exists if a crane tips over, can be prevented.

Third, Plaintiff's failure to warn claims do not meet the requirements of the MPLA. *See* MISS. CODE ANN. § 11-1-63(c)(i) & (ii); *McSwain v. Sunrise Med., Inc.*, 689 F. Supp. 2d 835, 842 (S.D. Miss. 2010). For all of these reasons and those contained in Manitowoc's accompanying *Daubert* motions, all of Plaintiff's claims must be dismissed as a matter of law.

## STATEMENT OF UNDISPUTED MATERIAL FACT

In support of its summary judgment motion, Manitowoc relies upon the following material, undisputed facts:

1.      Plaintiff's experts have provided multiple alternative design proposals, but have failed to select which of the proposals is their preferred design. (Singhose July Report; Singhose October Report; Vaughan July Report; Vaughan October 13 Report; Vaughan October 30 Report; Sorensen July Report; Sorensen October Report).

2.      Plaintiff's experts' alternative design proposals are not design, lack "specific information" and "specific design," and are no more than "conceptualized possibilities." (Singhose July Report; Singhose October Report; Singhose Depo. I; Singhose Depo. II; Vaughan July Report; Vaughan October 13 Report; Vaughan October 30 Report; Vaughan Depo. I;

Vaughan Depo. II; Sorensen July Report; Sorensen October Report; Sorensen Depo. I; Sorensen Depo. II).

3.      Plaintiff has not offered reliable expert testimony, or any other proof, that the proposed counterweight restraint mechanism will prevent the harm.  (Singhose July Report; Singhose October Report; Singhose Depo. I; Singhose Depo. II; Vaughan July Report; Vaughan October 13 Report; Vaughan October 30 Report; Vaughan Depo. I; Vaughan Depo. II; Sorensen July Report; Sorensen October Report; Sorensen Depo. I; Sorensen Depo. II).

4.       Plaintiff's experts' reports focus solely and exclusively on the forces involved in Mr. Williams' accident, and whether the proposed counterweight restraints would have prevented the harm in that one accident. (Sorensen October Report, at 32; Vaughan October 13 Report, at 10-11; Singhose October Report,  at 14, 25).

5.      Plaintiff has not offered any proof of the extent of the risk that the alternative design would have avoided. (Singhose July Report; Singhose October Report; Singhose Depo. I; Singhose Depo. II; Vaughan July Report; Vaughan October 13 Report; Vaughan October 30 Report; Vaughan Depo. I; Vaughan Depo. II; Sorensen July Report; Sorensen October Report; Sorensen Depo. I; Sorensen Depo. II).

6.      Plaintiff has not offered any proof as to the effectiveness of the alternative design in reducing the severity or frequency of accidents.  (Singhose July Report; Singhose October Report; Singhose Depo. I; Singhose Depo. II; Vaughan July Report; Vaughan October 13 Report; Vaughan October 30 Report; Vaughan Depo. I; Vaughan Depo. II; Sorensen July Report; Sorensen October Report; Sorensen Depo. I; Sorensen Depo. II).

7.      Dr. Vaughan had undertaken no analysis of what percentage of likely crane accidents could be prevented by any given restraint mechanism, or what percentage of accidents his own restraints will restrain the counterweights.  (Vaughan Depo. II, at 250).

8.      Dr. Vaughan has not opined, and cannot opine, that his counterweight restraints were going to work in every crane accident case.  (Vaughan Depo. II, at 252).

9.      Dr. Sorensen's cable angle warning system will require regular input from the crane on the weight of the load the crane is carrying.  (Sorensen Depo. I, at 137).

10.     The load cell would need to be working for the cable angle warning system to function as Dr. Sorensen intends.  (Sorensen Depo., at 137).

11.     At the time of this accident, Mr. Williams deactivated his crane's RCI/RCL for the main drum which operated his crane's main hoist (load) line.  (Manitowoc 30(b)(6) Depo., Taylor, at 84; Sorensen Depo. II, at 187).

12.      Mr. Williams overrode the RCI/RCL functions on his crane preceding this particular accident.  (Sorensen Depo. II, at 99).

13.     Dr. Sorenson is unable to provide any assurance that a cable angle warning system would have had any beneficial impact on this accident.  (Sorensen October Report, at 18).

14.     No standard setting body has ever required a warning such as the one Plaintiff and Plaintiff's expert, Dr. Singhose, have proposed.  (Singhose Depo. II, at 264).

15.     No crawler crane manufacturer has provided a warning such as the one Plaintiff and Plaintiff's expert, Dr. Singhose, have proposed.  (Singhose Depo. II at 264).

16.     There is no industry practice which provides warnings for falling counterweights in a catastrophic tipover such as that proposed by Dr. Singhose.  (Singhose Depo. II, at 265).

17.     Dr. Singhose's July Report proposed no specific warning or placard, and did not suggest the language to use.  (Singhose July Report).

18.     Dr. Singhose's October Report contained a new warning with placard, pictorial and proposed warning language.  (Singhose October Report).

19.     As to Dr. Singhose's claim that the Manitowoc warnings regarding tandem lifts were inadequate, he has not proposed any particular language, placement, or detail on this alleged deficiency, and his October Report did not provide any information on those deficiencies.  (Singhose July Report; Singhose October Report; Singhose Depo. I; Singhose Depo. II).

20.     The Model 16000 operators' manual warned of tipover in multiple locations. (Depo. Exhibit 74 – Compilation of Tipover Warnings in Model 16000 Manual).

21.     If a crane operator heeds these warnings and does not tip the crane over, there is no danger that the counterweights will leave their normal location, and no danger from falling counterweights.  (Singhose Depo. I, at 265; Singhose Depo. II, at 257-58).

22.     There is no evidence that Mr. Williams read the operators' manual for the crane, nor any evidence that, if he had read it, he was confused or misled by it.  (Singhose Depo. I, at 263).

23.     Dr. Dorris has opined without contradiction: "It is reasonable to expect that all employers, job planners, and qualified operators of large cranes will be aware of the risk of tip over.  It is intuitively obvious to reasonably prudent individuals that there is substantial risk of serious personal injury or death if a tip over does occur."  (Dorris Report, at 5).

24.     Julius Williams, Mr. Williams' boss and the lift director in charge of this particular lift, already knew the dangerous conditions regarding tandem lifts.  (Julius Williams

Depo., at 182-83; 195-98).  Julius Williams knew that the hoist lines on both cranes should be plumb, and he positioned spotters to determine whether the hoist lines were in fact plumb. (Singhose Depo. I, at 270).

25.     Two of the three crane operators participating in the lift which resulted in Mr. Williams' accident have, and had, as their goal to prevent tipover of the crane in the first place. (Abbott Depo., at 33-34; Smith Depo., at 33-35).

## ARGUMENT

## I.     PLAINTIFF HAS FAILED TO OFFER RELIABLE EVIDENCE OF A DESIGN DEFECT.

As more fully outlined in two separate Motions to Exclude Expert Testimony that are being filed concomitantly with this brief, the opinions offered by Plaintiff's proffered liability experts are unreliable and should be excluded.  Plaintiff cannot offer reliable evidence of a design defect without the opinions of a qualified, reliable expert.  This Court has consistently held that "[e]xpert testimony is generally necessary to prove a product was defective at least as to design and manufacture under [the MPLA]."  *Previto v. Ryobi N. Am., Inc.*, 2011 U.S. Dist. LEXIS 3853, 21 (S.D. Miss. Jan. 14, 2011) (quoting *McIntosh v. Nissan North America, Inc.*, 2008 U.S. Dist. LEXIS 91972, 2008 WL 4793743, at *3 (S.D. Miss. Oct. 28, 2008)); *see also Scirocco v. Ford Motor Co*., 2015 U.S. Dist. LEXIS 66561, 7 (S.D. Miss. May 21, 2015) ("Mississippi's federal courts have consistently held that plaintiffs cannot prove the existence of a product defect without expert testimony.")  In support of this statement in *Scirocco*, this Court included a string cite of cases that have required expert testimony to support design defect claims under the MPLA. *See Scirocco*, 2015 U.S. Dist. LEXIS 66561, 7 n.4 (citing *Harris v. Stryker Spine*, 39 F. Supp. 3d 846, 850 (S.D. Miss. 2014); *Cothren v. Baxter Healthcare Corp.*, 798 F. Supp. 2d 779, 782 (S.D. Miss. 2011); *Childs v. GMC*, 73 F. Supp. 2d 669, 671 (S.D. Miss.

1999); *Hammond v. Coleman Co.*, 61 F. Supp. 2d 533, 542 (S.D. Miss. 1999), *aff'd*, 209 F.3d 718 (5th Cir. 2000); *Wallace v. Ford Motor Co.*, 2013 U.S. Dist. LEXIS 91164, 4 (S.D. Miss. June 28, 2013); *Runnels v. Tahsin Indus. Corp., USA*, 2013 U.S. Dist. LEXIS 179701, 3 (S.D. Miss. Dec. 23, 2013); *Taylor v. Otis Elevator Co.*, 2012 U.S. Dist. LEXIS 103377, 8-9 (S.D. Miss. July 25, 2012)).

For example, in *Runnels v. Tahsin Indus. Corp., USA*, 2013 U.S. Dist. LEXIS 179701, (S.D. Miss. Dec. 23, 2013), the Court ultimately granted the manufacturer's Motion for Summary Judgment on the design defect claims because the plaintiff lacked reliable expert testimony on the essential elements of the claim. *Id.* at *32-33. In *Runnels*, the plaintiff asserted numerous MPLA claims when a ladder based deer stand collapsed while being setup by the plaintiff. *Id.* at *1-2. This Court found that only two of the plaintiff's three experts had the requisite knowledge and experience to testify to the plaintiff's alternative feasible design, which was that a ladder sleeve could have been added by the manufacturer to prevent this accident. *Id.* at 13-22. However, neither of these two experts was able to accurately provide admissible expert testimony as to whether the alternative feasible design would have actually worked in preventing this accident. *Id* at *17. One expert, Carbonara, "did not know the forces that were placed on the ladderstand's joints at the time of Runnels' fall" and "did not conduct any tests on the ladderstand or perform any calculations to support his opinion that the accident would not have occurred if the ladder sleeves had been used" while the other, Runnels, did not use "reliable methods to conclude that ladder sleeves would have prevented Runnels' accident." Id. at *21. Because that expert testimony was excluded, the plaintiff in *Runnels* could not meet those essential elements of the products claim and summary judgment was granted. Id. at *32-33.

This Court has also found that when expert testimony of a design defect is excluded, it is appropriate to find, as a matter of law, that a design defect claim cannot be maintained.  *See Harris v. Stryker Spine*, 39 F. Supp. 3d 846, 855-856 (S.D. Miss. 2014); *Hammond v. Coleman Co.*, 61 F. Supp. 2d 533, 542 (S.D. Miss. 1999).

Manitowoc's motions to exclude Drs. Singhose's, Vaughan's, and Sorensen's proposed opinions should be granted.  Without expert testimony regarding a feasible design alternative, both of Plaintiff's design defect claims fail as a matter of law.

**II.    PLAINTIFF HAS FAILED TO PROVE THAT THE ALTERNATIVE CONCEPTS PROPOSED BY PLAINTIFF'S PROFFERED LIABILITY EXPERTS WOULD PREVENT THIS ACCIDENT MUCH LESS ANY HARM.**

Plaintiff's design defect claims relating to the counterweight restraints and the cable angle warning system also fail because Plaintiff has not proven that the alternative designs proposed by Plaintiff's proffered liability experts would prevent the harm.  MISS. CODE ANN. § 11-1-62(f)(ii) provides that "a feasible design alternative is a design that would have to a reasonable probability **prevented the harm** . . ."  (emphasis added).  Plaintiff's feasible design alternatives must "prevent the harm" for all catastrophic tipovers (and not just for Mr. Williams' accident), and his experts must offer evidence to that effect.

In *Johnson v. Davidson Ladders, Inc*., 403 F. Supp.2d 544, 550 (N.D. Miss. 2005) quoted with approval in *Williams v. Bennett*, 921 So. 2d 1269, ¶ 19 (Miss. 2006), the Court held:

> [T]he plaintiffs failed to adduce any evidence to demonstrate the extent of the risk that the alternative design would have avoided ... More importantly, they offered no evidence relative to the effectiveness of the alternative design in reducing the severity or frequency of accidents.

The plaintiff in *Johnson* alleged that the defendant's ladder was defective and unreasonably dangerous because, among other things, the ladder at issue was less prone to "racking" than other

ladders, and that less racking necessarily meant fewer accidents. *Id*. Although the plaintiffs in *Johnson* had access to prior accident data from the product at issue (like Plaintiff has here), the plaintiff failed to prove how those accidents were similar to the accident at issue, or how the alternative design (with less racking) would have reduced the severity or frequency of accidents. *Id*. See also *Lavespere v. Niagara Machine & Toolworks, Inc*., 910 F.2d 167, 183 (5th Cir. 1990), abrogated on other grounds Little v. Liquid Air Corp., 37 F.3d 1069, 1075 n.14 (5th Cir. 1994.) ("[Plaintiff's] proof of the risk that might have been avoided by the alternative design . . . was, to say the least, incomplete.  Faced with this meager evidence, no reasonable trier of fact could have concluded that the balance of those two factors tipped in favor of the risk avoided. One cannot balance an indeterminate weight.").  Although applying the Louisiana Products Liability Act, the evidence the Fifth Circuit found lacking has equal applicability under the MPLA.  As the Fifth Circuit aptly explained, "there may be cases in which the judge or the jury, by relying on background knowledge and 'common sense,' can 'fill in the gaps' in the plaintiff's case, estimating the extent of the risk avoided . . . ," but that case was not one of them.  *Id*. Likewise, this is not a case in which a fact finder can rely on background knowledge to fill in the gaps in the case.  Plaintiff's claims herein involve technical issues which require analysis and opinions that can only be provided by qualified, reliable experts.

## A.   PLAINTIFF'S PROPOSED COUNTERWEIGHT RESTRAINTS AND BARRIERS WILL NOT PREVENT THE HARM.

All of Plaintiff's experts have focused their attention, and their reports on the forces involved in the accident, and whether the proposed counterweight restraints would have withstood those forces.[4]  While discussion of the accident is a necessary condition for Plaintiff's

---

[4]  Dr. Sorensen writes: "The objective of this section is to provide a first-order approximation of the actual deceleration forces that would have been required to secure the counterweights of Mr. Williams' crane." (Sorensen October Report, at 32).  See also Vaughan October 13 Report, at 10-11 (reaching conclusion that

experts' theory (i.e., without proof that it would have prevented the accident, Plaintiff's claim fails), it is not a sufficient condition.  As discussed above, Plaintiff's experts must establish that their design alternative is not only feasible, but that it would have prevented the harm in other accidents, and not just in Mr. Williams' accident.

Dr. Vaughan, for example, had undertaken no analysis of what percentage of likely crane accidents could be prevented by any given restraint mechanism, or in what percentage of accidents his own restraints will restrain the counterweights.  (Vaughan Depo. II, at 250).  Dr. Vaughan even admitted he could not testify that this was so: "Are these counterweight restraints going to work in every crane accident case?  I'm not comfortable saying that."  (Vaughan Depo. II, at 252).  Drs. Singhose and Vaughan have offered no other analysis which will prove that their proposed designs will "prevent the harm" in all catastrophic tipovers.  That deficiency, in and of itself, is fatal to Plaintiff's design defect claims relating to counterweight restraints.

Each of Plaintiff's proffered liability experts recognized the obligation of a design engineer not to just design to the last accident, but to all accidents.  Dr. Singhose admitted that the analysis for whether a counterweight restraint will prevent the harm must include, not only the circumstances of the Mr. Williams' accident, but other accident conditions which a Model 16000 might encounter.  According to Dr. Singhose:

> When you're [] designing a restraint system, you don't just design it for the softest case or the least violent case.  There's usually a threshold of reasonable anticipated conditions that you need to meet.

(Singhose Depo. II, at 33).

---

deceleration forces in Williams accident was 0.06 g's); Singhose October Report, at 14 ("[a]t this point in Mr. Plaintiff's tip-over event . . ."); Singhose October Report, at 25 ("approximating the deceleration distance during the Plaintiff's incident . . .").

Dr. Singhose continued: "We definitely need to design the restraint to the reasonably foreseeable conditions that would occur in a tip-over." (Singhose Depo. II at 34). Dr. Sorensen confirmed that the design engineer must not only design to last accident, but "the engineer is tasked with designing a product[] that can overcome safety hazards of foreseeable use." (Sorensen Depo. II at 206). Yet, Drs. Singhose's, Vaughan's and Sorensen's October Reports dealt exclusively with whether the counterweight restraints would have withstood the forces in Mr. Williams' accident alone.

Consequently, not only have Plaintiff's proffered liability experts failed to prove that their proposed design alternatives will prevent the harm in all reasonably anticipated conditions, the proof here is deficient as a matter of law. Plaintiff's and Plaintiff's proffered experts have failed to meet an essential element of Plaintiff's claim – that the counterweight restraints "will prevent the harm." MISS. CODE ANN. § 11-1-62(f)(ii). There is no proof of the "extent of the risk that the alternative design would have avoided" or the "the effectiveness of the alternative design in reducing the severity or frequency of accidents," as expressly required by the Court in *Johnson v. Davidson Ladders, supra,* 403 F. Supp.2d at 550. Because Plaintiff has offered no proof at all on this essential element, "[o]ne cannot balance an indeterminate weight" and this Court, like the Fifth Circuit in *Lavespere, supra*, 910 F.2d at 183, should dismiss this claim.

### B. PLAINTIFF'S PROPOSED CABLE ANGLE WARNING SYSTEM WOULD NOT PREVENT MR. WILLIAMS' ACCIDENT NOR NECESSARILY ANY OTHER ACCIDENTS.

Dr. Sorensen's "concept" for his cable angle warning system will require regular input from the crane on the weight of the load the crane is carrying. (Sorensen Depo. I, at 137). The Model 16000 is equipped with a load cell which measures the weight of the load. That load cell,

according to Dr. Sorensen, would need to be working for his cable angle warning system to function as intended:

> Q.     And so – so your system here requires the input of load within the – the weight of the load within the lift, true?
>
> A.     It would use data from the load cell.  So whatever the load cell is measuring, that's what it would use.
>
> Q.     Okay.   And that needs to be doing its thing during the entire course of the lift, true?
>
> A.     The load cell, our system would use information from the load cell.

(Sorensen Depo. I, at 137).

The Model 16000 is equipped with a Rated Capacity Indicator/Rated Capacity Limiter (RCI/RCL) which displays on a screen in the operator cab.  The operator selects which drum he will be lifting from, activates that drum, and the RCI/RCL will display information that will assist the operator with the operation of the crane, such as the boom angle and the weight of the load that is being carried.  The RCI/RCL gets its information about the weight of the load from the crane's load cell.  The RCI/RCL will also provide alarms when that load approaches the rated capacity, and will "limit" the operator's ability to exceed the rated capacity unless the operator chooses to override this aid.

The facts will demonstrate that the load cell which measures the weight of the load on Mr. Williams' crane had not been operating since January, 2014 – more than five months prior to this accident.  (Julius Williams Depo., at 177)(Depo. Exhibit 14) (Plaintiff's handwritten daily inspection sheets in which Mr. Williams wrote some variation of "load cell #1 drum don't work" from January 6, 2014 until June 16, 2014).  Two days before this accident, the load cell was allegedly replaced, but it was still not functioning properly. (Julius Williams Depo., at 164-65,

167)(Depo Exhibit 15) (Plaintiff's handwritten daily inspection sheet found at the accident scene which stated "load cell #1 drum don't work.").

As a result of the non-functioning load cell, Mr. Williams de-activated his RCI/RCL for the main drum which operated his main line and operated the crane without any input from the RCI/RCL.  (Manitowoc 30(b)(6) Depo., Taylor, at 84).  Once Mr. Williams deactivated the main drum, that meant that the RCI/RCL screen would not present load cell information (such as weight of the load, percentage of capacity, etc).  *Id*.  Dr. Sorensen conceded all of those facts and testified that, in this case, Mr. Williams "changed the RCI screen so it was not monitoring the drum which he was using."  (Sorensen Depo. II, at 187).

Those undisputed facts are critical because Dr. Sorensen's cable angle warning system will work if, and only if, that system is receiving information regarding the weight of the load. Once Mr. Williams de-activated the drum on the RCI/RCL, or turned it "off," then Dr. Sorensen's cable angle warning system would not have, and could not have, warned or prevented this accident. For that very reason, Manitowoc's expert, Brad Closson, will testify at trial that a cable angle warning system such as that proposed by Sorensen would not have prevented this accident.  (Closson Report, at ¶ IV.A.1.x, at 13).  According to Mr. Closson, because of VT Halter's failure to provide a working load cell for Mr. Williams' crane for five months prior to this accident and on the day of this accident, "there is no assurance that the crane's owner would have expended the time and money to assure that the device was working during crane operations."  *Id*.

Dr. Sorensen's October Report also admitted that no one would ever be able to testify that his cable angle warning system would have prevented this accident.  In Dr. Sorensen's

October Report and in response to Mr. Closson's opinion that a cable angle warning system would not have prevented this accident, Dr. Sorensen wrote:

> Mr. Clausen stated that 'there is no assurance that [a cable angle warning system] would have [had] any beneficial impact on this incident.'  **I agree with this opinion**.  This is because, had the system been installed, one cannot be certain that it would have been enabled by the operators, or maintained in working order.

(Sorensen October Report, at 18) (emphasis added).

In his deposition, Dr. Sorensen confirmed that "any time you have an option of being disabled, it could be disabled."  (Sorensen Depo. II, at 186).  Dr. Sorensen was aware that the RCI/RCL functions on this particular crane preceding this particular accident were overridden. (Sorensen Depo. II, at 99).  For that reason, even if a cable angle warning system existed and could have been applied to crawler cranes in general, and even if it had been installed on Mr. Williams' crane preceding this accident, the cable angle warning system would not have prevented this accident.  Consequently, Plaintiff has not established a feasible design alternative "that would have to a reasonable probability **prevented the harm** . . ."  MISS. CODE ANN. § 11-1-62(f)(ii) (emphasis added).  Moreover, Plaintiff has not offered any  proof of the "extent of the risk that the alternative design would have avoided" or the "the effectiveness of the alternative design in reducing the severity or frequency of accidents," as expressly required by the Court in *Johnson v. Davidson Ladders, supra,* 403 F. Supp.2d at 550.

## III.    PLAINTIFF'S FAILURE TO WARN CLAIMS DO NOT MEET THE REQUIREMENTS OF THE MPLA.

Plaintiff's failure to warn claim is founded upon the expert testimony of Dr. Singhose. For the reasons set forth in the accompanying *Daubert* Motion to Exclude Expert Testimony of Dr. Singhose, Vaughan, and Sorensen, Dr. Singhose is not qualified to render expert opinions regarding the adequacy of warnings in this case.   Aside from Dr. Singhose's lack of

qualifications to render such an opinion, Plaintiff's failure to warn claim is deficient as a matter of law.

In Dr. Singhose's July Report, he identified two deficiencies in the Model 16000 warnings and instructions: "no warning about that the counterweights can slide off and impact the operator cab" and "Manitowoc's warning of the hazards that arise from tandem lifts is inadequate and confusing."   (Singhose July Report, at ¶ 18).   However, Dr. Singhose's July Report proposed no specific warning or placard, and did not even suggest the language to use.

As to the first warning claim, Dr. Singhose testified in his first deposition that he "didn't plan on a detailed warning" of what the warning should say, but testified that "if it starts to tilt forward with this design, they need to jump off the crane and run away as fast as they can, because those counterweights are likely to fall off and smash into them. So they need a warning like that." (Singhose Depo. I, at 260).  Dr. Singhose has not explained how the operator jumping over a railing from a cab sitting more than ten feet off the ground, as the cab is rotating forward in the tipover, while the load is falling, and while parts of the crane are crashing and falling to the ground would not also subject the operator to injury or death.

After Manitowoc deposed Dr. Singhose and exposed the weaknesses of his opinions, Dr. Singhose submitted his October Report which contained a brand new warning.  In that report, Dr. Singhose submitted a figure of his warning, which included a pictorial and actual warning language.   (Singhose October Report, at 47). Dr. Singhose submitted this new warning "[i]n response to this criticism of my opinion," and not because he lacked anything to create it in the first place.  (Singhose Depo. II, at 247-49).  Although Dr. Singhose still wants the operator to jump out of the cab to avoid the hazard, Dr. Singhose conceded that his proposed warning doesn't tell the operator what to do at all, and offered as an excuse, "[y]ou can't put all that

information on there." (Singhose Depo. II, at 260).   Consequently, Dr. Singhose's warning doesn't tell the operator how to avoid the harm, which Dr. Singhose conceded was one of the three essential elements of a warning.  (Singhose Depo. II, at 256).  Dr. Singhose's new warning does not comply with Z535 because its signal word, DANGER, can only be used for hazards that "will result in death or serious injury."  ANSI Standard Z535.4-2011, at 4.14.1.  Dr. Singhose's own language ("Falling Counterweights **Can** Impact Cab") make use of the DANGER signal word even though, according to Dr. Singhose, the hazard is only a possibility ("can") and not a certainty ("will").[5]

On the second purported warnings inadequacy, Dr. Singhose's proposed warning is even more vague.  Although Dr. Singhose has not yet proposed specific language which such a warning should communicate, he testified generally in his first deposition that:

> It needs to tell them that when they're involved in a tandem lift, that their payload is not freely suspended, their load charts don't apply, and they need to monitor that cable angle very closely and keep it within a small range.

(Singhose Depo., at 269).

To this day, Dr. Singhose has not proposed any particular language, placement, or detail on this alleged deficiency, and even his October Report did not attempt to correct those deficiencies.

No standard setting body has ever required a warning such as the one Dr. Singhose has proposed.  (Singhose Depo. II, at 264).  Nor is Dr. Singhose aware of a single crawler crane manufacturer which has provided such a warning.  (Singhose Depo. II at 264). Nor is there any

---

[5]  Manitowoc has designated its own expert on warnings, Dr. Nathan Dorris, who has taken and taught courses on warnings, and actually serves on the ANSI Z5353 Committee, which promulgated industry standards on warnings. (Dorris Report, at 1). According to Dr. Dorris, Dr. Singhose's warning "does not conform to ANSI Z535.4." (Dorris Report, at 8).  Equally as important, Dr. Dorris has questioned virtually every aspect of Dr. Singhose's proposed warnings, and concluded that "Manitowoc acted reasonably and properly in addressing the crane tip hazard through the existing warning and instructions."  (Dorris Report, at 4).

industry practice which requires warnings for falling counterweights in a catastrophic tipover. (Singhose Depo. II, at 265).  In fact, the only people which Dr. Singhose knows of who join Dr. Singhose in believing such a warning is necessary include the lawyers Dr. Singhose works for, Dr. Singhose's wife, and the owner of the sign company that Dr. Singhose hired to make his placard.  (Singhose Depo. II at 266-67).

A. **THE MISSISSIPPI PRODUCTS LIABILITY STATUTE AND RELATED CASE LAW ESTABLISH A HIGH BURDEN FOR FAILURE TO WARN CLAIMS.**

To assert a claim for inadequate warning under the MPLA, a plaintiff must prove all of the elements contained in MISS. CODE ANN. § 11-1-63(c)(i) & (ii).  For purposes of this motion, the Plaintiff must prove, that "the ordinary user or consumer would not realize its dangerous condition" without the warning and the warning is one that "communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product . . ." *Id*. "The claimant must also show that the inadequate warning rendered the product 'unreasonably dangerous to the user' and that the inadequate warning proximately caused the damages to the claimant." *McSwain v. Sunrise Med., Inc.*, 689 F. Supp. 2d 835, 842 (S.D. Miss. 2010) (citing MISS. CODE ANN. § 11-1-63(a)(ii) & (iii)).  The warning is not inadequate or defective when the warnings in the operator's manual specifically warned of the dangers.

In *McSwain*, the manufacturer of a wheel chair warned about the rear tip-over of its product in multiple locations in the operator's manual.  Consequently, the warnings were held adequate because "[t]he warning not only warned of the potential of rear tip over, but also provided explicit directions on how to avoid the possibility of rear tip over." *McSwain*, 689 F. Fupp. 2d at 842.  For that reason, the warning was adequate "because it warned of the specific

risk of injury that McSwain complains occurred." *Id.*  Likewise, the warning on a table saw was adequate when it warned that foreign objects could be thrown into the operator's eyes if proper eye protection was not worn, even though the manual did not recite the "specific hazard involved" (i.e., that the carbide tip could come off the blade during operation).  *Previto v. Ryobi N. Am., Inc*., 2011 U.S. Dist. LEXIS 3853, 15 (S.D. Miss. Jan. 14, 2011).

Mississippi courts have consistently held "[t]he presence or absence of anything in an unread owner's manual simply cannot proximately cause a plaintiff's damages." *Palmer v. Volkswagen of Am., Inc.*, 904 So. 2d 1077, 1084 (Miss. 2005); *see also Previto,* 2011 U.S. Dist. LEXIS 3853, 15 (this Court dismissed a claim of inadequate warning based on what was in an operation manual that was not read by the plaintiff); *McSwain*, 689 F. Supp. 2d at 842-843.  In *Palmer*, the Court concluded that: "this case does not involve plaintiffs who were misled by the manual. The plaintiffs in this case did not read the manual at all. Thus, they hardly can claim to have been harmed or misled by it." *Palmer*, 904 So. 2d at 1084.

Moreover, "[a] key element of causation in a failure-to-warn claim under Mississippi law 'is proof of a causal link between the plaintiffs' injuries and the product's allegedly lacking a warning or having an inadequate warning. In other words, the failure to warn must be <u>the</u> proximate cause of the injuries suffered <u>or it is irrelevant</u>." *Previto*, 2011 U.S. Dist. LEXIS 3853, *13 (emphasis added) (quoting *3M Co. v. Johnson*, 895 So. 2d 151, 166 (Miss. 2005)).  If the allegation is that Manitowoc failed to provide any warning, then Plaintiff must show that had the warning been contained in the instructions that were provided, that such warning would have altered his conduct.  Likewise, "where a plaintiff complains that a given warning was defective, the plaintiff must have read and relied upon the defective warning to complain of it." *Mine Safety Appliance Co. v. Holmes*, 171 So. 3d 442, 453 (Miss. 2015) (quoting *Palmer*, 904 So. 2d

at 1094).  The Mississippi Supreme Court has specifically outlined this requirement in reversing and rendering a JNOV in favor of a defendant in a failure to warn case:

> It is undisputed in Holmes's case that the Dustfoe 66 respirator came with instructions. Yet Holmes proffered no testimony whatsoever that he or Groome read the instructions, or that, had the instructions contained a use limitation or warning, <u>that such a warning or limitation would have altered Holmes's or Groome's behavior</u>. Holmes simply argues the warnings provided by MSA were inadequate. And, as this Court stated in Palmer, "[i]nadequate warnings cannot serve as the proximate cause of injuries where adequate warnings would have resulted in the same injuries." That is, where a plaintiff fails to show the warning provided was the proximate cause of his injury, the defendant must prevail as a matter of law.

*Id.* at 453 (quoting *Palmer*, 904 So. 2d at 1094) (emphasis added).

In sum, the MLPA requires that Plaintiff prove that:  "(1) the product in question was defective because it failed to contain adequate warnings or instructions, (2) the inadequate warnings *rendered* the product unreasonably dangerous to the user or consumer, and (3) the inadequate warning proximately caused the damages for which recovery is sought."  *Williams v. City of Cleveland*, 736 F.3d 684, 687 (5th Cir. 2013) (citing Miss. Code Ann. § 11-1-63(a)).

## B.  PLAINTIFF'S FAILURE TO WARN CLAIM HAS NOT MET THE HEAVY BURDEN ESTABLISHED UNDER THE MPLA AND RELEVANT CASE LAW.

Plaintiff's failure to warn claims must be dismissed for several reasons.  First, Plaintiff cannot establish that the lack of warning rendered the product defective or that it proximately caused this accident.  Dr. Singhose testified that the Model 16000 would still be defective <u>**even after**</u> his warning was placed on it:

> Q.    Yes, sir.  So if I put this warning on the Model 16000, is it no longer defective and unreasonably dangerous in your mind?
>
> A.    <u>**I think that it's still defective and unreasonably dangerous**</u>, but the degree to which it's dangerous is less.

> There's always degrees to all of this stuff. I think that
> placard helps make the machine a little bit less dangerous.

(Singhose Depo II, at 263-62) (emphasis added).  Consequently, if the Model 16000 was still defective even after Dr. Singhose's own warning was given, then the proximate cause of the injury was something else – and not the failure to warn.  This admission alone subjects Plaintiff's failure to warn claims to dismissal as a matter of law.

Second, the undisputed evidence (in fact evidence gathered and used by Plaintiff's own counsel) is that the Model 16000 operators' manual warned of the specific risk complained of – in this case, tipover – in multiple locations.  That manual contained dozens of separate warnings regarding the tipover of the crane.  (Depo. Exhibit 74 – Compilation of Tipover Warnings in Model 16000 Manual).  In fact, counsel for Plaintiff compiled these warnings, and cross-examined Manitowoc and each of its expert witnesses on them.  (Olivas Depo., at 21 - 36).

If the crane operator heeds these warnings and does not tip the crane over, there is no danger that the counterweights will become dislodged, and there will be no danger from falling counterweights.  (Singhose Depo. I, at 265; Singhose Depo. II, at 257-58).  If the crane operator tips over the crane, there are an infinite combination of catastrophic consequences which can and will occur to the crane body, the boom, the load, and, perhaps, to the counterweights and the cab.  (Singhose Depo. II, at 258-59).  While Manitowoc did not warn of each one of those infinite and specific hazards which might happen in the event of a tipover, Manitowoc warned against tipover.

As in *McSwain*, *supra*, the warning is not inadequate or defective at all if the operator's manual warned against the "specific risk of injury" which occurred.  Manitowoc warned against tipover just as Ryobi warned against flying objects in the *Previto* matter. In *Previto*, the requirement of eye protection and adherence to that warning would have prevented the harm

which occurred.  Likewise, Mr. Williams' incident would not have occurred if Manitowoc's warnings and instructions were followed.  Manitowoc, again according to *Previto*, was not required to warn against the "specific hazard involved" (i.e., falling counterweights) just like Ryobi was not required to warn that the carbide tip could come off of the saw blade.  Adherence to the general warning (i.e., tipover) would have prevented all of the hazards stemming from the tipover, and would have prevented this injury in particular.  (Singhose Depo. II, at 261-62).  For all of these reasons, the warnings were adequate as a matter of law.

Third, as was the case after Dr. Singhose's July Report and is still the case after Dr. Singhose's October Report, Plaintiff still fails to show that any alleged omission or inadequacy of a warning was the <u>proximate cause of Plaintiff's injuries</u>.  There is absolutely no proof that Mr. Williams read the manual, and failed to understand it.  Plaintiff has come forward with no direct or indirect evidence that he read the operator's manual, and certainly no evidence that he was confused or misled by it.  Dr. Singhose confirmed that there was no such evidence. (Singhose Depo. I, at 263).  In fact, Plaintiff's boss and lift supervisor on this lift testified that he had never read the operators' manual on any crane.  (Julius Williams Depo. I, at 144).  "The presence or absence of anything in an unread owner's manual simply cannot proximately cause a plaintiff's damages."  *Palmer, supra,* 904 So. 2d at 1084.

Fourth, the warnings which Dr. Singhose proposes are perfectly obvious, and already known by the experienced crane operators involved in this accident.  Mr. Williams was a certified crane operator, had many years of experience in cranes, and was, by all accounts, was a safe and diligent operator.  (Singhose Depo. I, at 263-64).  Indeed, the risk of tipover is, in fact, perfectly obvious.[6]  Julius Williams, Johnny Williams' boss and the lift director in charge of this

---

[6] Dr. Dorris has opined without contradiction: "It is reasonable to expect that all employers, job planners, and qualified operators of large cranes will be aware of the risk of tip over.  It is intuitively obvious to reasonably

particular lift, already knew the increased risk that must be planned for when performing tandem lifts. (Julius Williams Depo., at 182-83; 195-98). Dr. Singhose acknowledged that Julius Williams knew that the hoist lines on both cranes should be plumb, and he positioned spotters to determine whether the hoist lines were in fact plumb. (Singhose Depo. I, at 270). As to the alleged risk of counterweights falling into the cab, David Smith, the crane operator involved in the tandem lift with Mr. Williams' crane at the time of this accident, testified that, even after this tragic accident occurred, Smith has no problem with the Model 16000,

> Q. Do you have any problem about operating a Manitowoc 16,000 right now with the way those counterweights are?
>
> A. No, absolutely not.
>
> Q. Even after this accident, David Smith says he'd go climb in that Manitowoc 16,000 and operate it?
>
> A. I've been in the other 16,000 that came in after this, I was in them. No problem. They are built the same way.

(Smith Depo., at 174).

Finally, there is also no proof that Mr. Williams would have done anything differently had he been specifically warned, for example, that counterweights could hit the cab in the event of a tipover. Mr. Williams' goal, and the goal of every other crane operator, was to prevent the crane from tipping over in the first place. Harold Abbott, the third crane operator involved in the lift resulting in this accident, testified that his goal was to prevent tipover for the protection of everyone working around that crane (and not just the operator). (Abbott Depo., at 33-34). David Smith, the other operator along with Mr. Williams on this lift, resoundingly agreed. (Smith Depo., at 33-35). If the operators' goal is to prevent the tipover in the first place and they are

---

prudent individuals that there is substantial risk of serious personal injury or death if a tip over does occur." (Dorris Report, at 5). That conclusion is undisputed.

provided adequate information about how to avoid that tipover, then adding "warnings" about what other catastrophic consequences from a tipover will not cause them to act any differently. Stated differently, Plaintiff cannot argue, and has not argued, that the specific information proposed in Dr. Singhose's warning would have resulted in any different behavior on Mr. Williams' part. As in *Previto*, Plaintiff's claim cannot proceed absent specific proof that Mr. Williams would have acted upon the proposed warning in a manner which would have avoided his injuries. *Previto*, 2011 U.S. Dist. LEXIS 3853, *17 (citing *3M Co. v. Johnson*, 895 So. 2d 151, 166 (Miss. 2005)).

## <u>CONCLUSION</u>

For the foregoing reasons, Manitowoc is entitled to Summary Judgment on Plaintiff's claims.

Respectfully submitted, this the 16th day of May, 2016.

MANITOWOC CRANES, LLC

BY:   BALCH & BINGHAM LLP

BY:   /s/ Walter H. Boone
        Of Counsel

Walter H. Boone (MSB # 8651)
BALCH & BINGHAM LLP
188 East Capitol Street, Suite 1400
P.O. Box 22587
Jackson, MS 39225-2587
Telephone: (601) 965-8179
Facsimile: (888) 856-9542
wboone@balch.com

Matthew W. McDade (MSB # 103207)
BALCH & BINGHAM LLP
1310 Twenty Fifth Avenue
Gulfport, MS 39501
Telephone: (228) 864-9900
Facsimile: (228) 864-8221
mmcdade@balch.com

200057.7                                        26

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served a true and correct copy of the above and foregoing pleading by the Court's electronic filing system which sent notification to the following counsel of record:

Ben F. Galloway, III
Owens, Galloway, & Myers, PLLC
P O Drawer 420
Gulfport, MS 39502-0420
bfg@owen-galloway.com

Bryan E. Comer
Desmond V. Tobias
Jason McCormick
Tobias, McCormick & Comer, LLC
1203 Dauphin Street
Mobile, AL 36604
bryan@tmclawyers.com
desi@tmclawyers.com
Jason@tmclawyers.com

This, the 16th day of May, 2016.

/s/ Walter H. Boone