IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| WANDA WILLIAMS, *Individually and as Conservator for John Robert Williams, Jr., Incapacitated* | § § § § § | PLAINTIFF |
| v. | § § § | Civil No. 1:14CV383-HSO-JCG |
| MANITOWOC CRANES, LLC | § § | DEFENDANT |

MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANT'S [271] MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is the Motion for Summary Judgment [271] filed by

Defendant Manitowoc Cranes, LLC. This Motion is fully briefed. Having

considered the Motion, related pleadings, the record, and relevant legal authority,

the Court is of the opinion that the Motion [271] should be granted in part and

denied in part. Plaintiff's design-defect claims will be dismissed with prejudice, and

Plaintiff's warnings and loss-of-consortium claims will proceed to trial.

I. BACKGROUND

A. Factual background

Plaintiff Wanda Williams ("Plaintiff") is the wife and duly-appointed

guardian and conservator of John Robert Williams, Jr. ("Mr. Williams"). 3d Am.

Compl. [118] at 1. On June 25, 2014, Mr. Williams was working as a crane operator

at VT Halter Marine, Inc.'s ("VTHM"), shipyard in Pascagoula, Mississippi, when he

was severely injured when his crane experienced a tip-over. *Id.* Plaintiff's Complaint alleges that the crane Mr. Williams was operating at the time of his injury was a Manitowoc 2010 Model 16000 Series crane. *Id.* at 6-7. VTHM had contracted with H&E Equipment Services ("H&E") in 2010 to purchase two of the Manitowoc 2010 Model 16000 Series cranes. *Id.* at 6.

According to Plaintiff's proffered expert, Dr. William Singhose ("Dr. Singhose"), the Model 16000 crane is a crawler crane which employs unsecured, moveable counterweights for stabilization. Dr. Singhose's Report [271-1] at 12, 20.

> The Series 3 counterweight system used on the crane involved in Mr. Williams' incident consists of a bottom tray that is mechanically secured to the rotating body of the crane. However, the rest of the counterweight system consists of 18,000 lbs steel blocks that are simply stacked on top of each other without being mechanically secured by bolts, chains, straps, or the like. When the crane tilts, the counterweight boxes behave like blocks on an incline plane.

*Id.* at 21.

During a tandem lift operation with another Model 16000 crane on June 25, 2014, the Model 16000 crane that Mr. Williams was operating tipped forward. *Id.* at 5, 6, 8-9, 13. According to Dr. Singhose, the tip-over occurred because the payload was pulled away from Mr. Williams' stationary crane by the other crane, operated by David Smith, which in turn caused Mr. Williams' crane's hoist cables attached to the payload to deviate from the vertical position. *Id.* at 13, 30.

According to Plaintiff's Third Amended Complaint, the tip-over resulted in "counterweights 'raining down' on the Williams crane's cab slinging the cab underneath the crane." 3d Am. Compl. [118] at 12.

> The force of the impact from one or more counterweights striking the rear of the Williams crane's cab was with such force that it detached the cab from the crane body and ejected Williams from the cab causing him catastrophic permanent injuries.

*Id.* Plaintiff alleges that, at the time of the incident, "the Williams crane was in substantially the same condition as it was when it was designed, manufactured, and placed in the stream of commerce by Manitowoc and distributed by H&E." *Id.*

B.  Procedural history

Plaintiff filed suit in this Court on October 9, 2014, on the basis of diversity jurisdiction.  On June 16, 2015, Plaintiff filed a Third Amended Complaint [118], naming Manitowoc Cranes, LLC ("Defendant" or "Manitowoc") as the sole Defendant.  The Third Amended Complaint [118] remains the operative pleading and advances claims against Defendant for defective product, defective design, and negligence under the Mississippi Products Liability Act, Mississippi Code § 11-1-63 ("MPLA"), and under common law, including a loss-of-consortium claim.  3d Am. Compl. [118] at 12-23.  As the parties appear to agree, other than a derivative loss-of-consortium claim, these state-law claims fall generally into two categories: design-defect and warnings claims, all under the MPLA.  *See* Def.'s Mem. in Supp. of Mot. for Summ. J. [272] at 3; Pl.'s Mem. Br. in Opp'n to Mot. for Summ. J. [288] at 20-28 (discussing his design-defect and failure-to-warn claims).[1]

---

[1] Under Mississippi law, all negligence and strict-liability claims are subsumed by the MPLA.  The MPLA provides the exclusive remedy for products-liability claims in Mississippi, and "applies 'in *any* action for damages caused by a product,' with deviation defects, warnings or instruction defects, design defects, and where a product breached an express warranty." *Elliott v. El Paso Corp.*, 181 So. 3d 263, 268 (Miss. 2015) (emphasis in original) (quoting Miss. Code Ann. § 11-1-63).

On May 16, 2016, Defendant filed the present Motion for Summary Judgment [271]. Defendant seeks dismissal of Plaintiff's design-defect and warnings claims. Mot. for Summ. J. [271] at 5.[2]

## II. DISCUSSION

### A. Summary judgment standard

Rule 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden and must identify 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant carries this burden, "[t]he burden then shifts to the nonmovant to demonstrate a genuine issue of material fact, but the nonmovant cannot rely on the allegations in the pleadings alone." *Id.* "Instead, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Id.* (quotation omitted). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Id.* (quotation omitted).

---

[2] This Motion does not address Plaintiff's derivative claim for loss of consortium.

To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that there exists a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). "A genuine dispute of material fact means that evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC&R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quotation omitted). If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Cutting Underwater Techs. USA, Inc. v. ENI U.S. Operating Co.*, 671 F.3d 512, 516 (5th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

In deciding whether summary judgment is appropriate, "[i]t is axiomatic that the 'evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Davis v. Davis*, 826 F.3d 258, 264 (5th Cir. 2016) (quoting *Tolan v. Cotton*, U.S. , 134 S. Ct. 1861, 1863, 188 L. Ed. 2d 895 (2014)). The Court "must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment . . . ." *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016) (quotation omitted).

B.    <u>Summary judgment is appropriate as to Plaintiff's design-defect claims.</u>

As the Court appreciates Plaintiff's position based upon her Third Amended Complaint, briefing, and exhibits, she is advancing two design-defect claims. One claim is based upon Plaintiff's contention that the

crane lacked a device, guard, restraint, bolt, chain, or mechanism that
prohibited and prevented the counterweights from striking the cab of
the Williams crane when the crane 'got light,' tipped forward, or tipped
over.

3d Am. Compl. [118] at 13.  The second claim is that the "crane lacked a device,

sensor or other mechanism to monitor the angle of the hoist line holding the load,

especially during 'tandem lifts.'" *Id.*  Defendant seeks summary judgment on both of

these design-defect claims.

      1.     Design-defect claims under the MPLA

In order to prove a design-defect claim under the MPLA,

the plaintiff must prove, by the preponderance of the evidence, that
"the product was designed in a defective manner," that "[t]he defective
condition rendered the product unreasonably dangerous to the user or
consumer," and that "[t]he defective and unreasonably dangerous
condition of the product proximately caused the damages for which
recovery is sought."

                          \*  \*  \*

Additionally, a plaintiff making a design-defect claim must prove by
the preponderance of the evidence the existence of a feasible design
alternative:

> The product failed to function as expected and there
> existed a feasible design alternative that would have to a
> reasonable probability prevented the harm. A feasible
> design alternative is a design that would have to a
> reasonable probability prevented the harm without
> impairing the utility, usefulness, practicality or
> desirability of the product to users or consumers.

*Elliott v. El Paso Corp.*, 181 So. 3d 263, 271 (Miss. 2015) (quoting Miss. Code Ann.

§§ 11-1-63(a)(i)(3), (a)(ii), (a)(iii), and (f)(ii)) (emphasis removed).  "[D]emonstrating

a feasible alternative design as proof of a design defect is elemental to a claimant's

prima facie case."  *Id.* (quotation omitted).

The MPLA defines a "feasible design alternative" as "a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." Miss. Code. Ann. § 11-1-63(f)(ii). "[A] plaintiff establishes a design defect by proving a product could have been made safer by the adoption of a reasonable alternative design." *Williams v. Bennett*, 921 So. 2d 1269, 1275 (Miss. 2006) (citing Restatement (Third) of Torts: Prod. Liab. § 2 (1998)). The Mississippi Supreme Court has explained that "[i]f an alternative design could have been practically adopted at the time of sale, and if the omission of such an alternative design rendered the product not reasonably safe, then a design is defective." *Id.*

A feasible design alternative is "required by Miss. Code Ann. Section 11-1-63(f)(ii)." *Williams*, 921 So. 2d at 1277. As the Mississippi Supreme Court has stated,

> [i]n Mississippi, the legislature has codified the requirements unique to a design defect claim and laid out an explicit blueprint for claimants to prove when advancing such a claim. When claimants do not fulfill their statutory obligation, they leave the courts no choice but to dismiss their claims because they fail to proffer a key element of proof requisite to the court's determination of whether the claimant has advanced a valid claim under the statute.

*Id.*

2.     <u>Plaintiff has presented insufficient evidence of a feasible design alternative for either of her design-defect claims.</u>

In support of both of her design-defect claims, Plaintiff has relied upon the testimony and Reports of her designated experts, Dr. William Singhose, Dr. Joshua Vaughan, and Dr. Khalid Sorensen, in an attempt to demonstrate the existence of a

feasible design alternative within the meaning of the MPLA. *See* Pl.'s Mem. in Supp. of Resp. [288] at 9-12. Dr. Singhose and Dr. Sorensen offered alternative concepts for a cable angle monitoring or warning system to rectify the alleged design defect caused by the lack of a monitor for cable angles, while Dr. Singhose and Dr. Vaughan proposed different restraint devices to secure or restrain the counterweights on the crane to prevent them from falling into the operator's cab. All three of these experts' feasible design alternatives have been excluded by the Court in its previous Order [327], dated September 21, 2016, which among other things prohibited all three of these experts from offering testimony at trial as to any of their proposed feasible design alternatives. *See* Order [327].

The United States Court of Appeals for the Fifth Circuit has recognized "that the MPLA's plain language does *not* state expert testimony is required *per se* to prove a design defect." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 331 (5th Cir. 2004) (citing Miss. Code Ann. §§ 11-1-63(a), (b), (f)) (emphasis in original). This Court has previously held in an MPLA case that "to sustain [a plaintiff's] burden that a product was defective and that such defect caused the plaintiff's injury, expert testimony is generally required." *Harris v. Stryker Spine*, 39 F. Supp. 3d 846, 850 (S.D. Miss. 2014).

The Mississippi Supreme Court has also held in non-MPLA cases that expert testimony can be required based upon the specific facts of the case. *See Ala. Great S. R.R. Co. v. Jobes*, 156 So. 3d 871, 883 (Miss. 2015) (reversing denial of summary judgment on negligence claim where plaintiff failed to offer expert testimony on

"highly technical issues" which were beyond the capabilities of the average lay person); *Latham v. Hayes*, 495 So. 2d 453, 460 (Miss. 1986) (en banc) (affirming trial court's directed verdict for defendant in medical malpractice case and noting need for expert testimony to address "factors beyond the common knowledge of a lay jury").

Having thoroughly considered the substance of Plaintiff's design-defect claims, the Court concludes that expert testimony is necessary to support both of Plaintiff's design-defect claims given the specific and highly technical facts of this case. The issues related to a feasible design alternative for the Model 16000 crane, with respect to either a counterweight restraint or a cable angle monitoring or warning system, or both, fall beyond the grasp of the average lay person.

Because Plaintiff will not be able to establish the existence of a feasible design alternative through admissible expert testimony at trial based upon the Court's exclusion of her experts' opinions on this topic, she cannot create a material fact question on an essential element of her design-defect claims, and her design-defect claims cannot withstand summary judgment. *See Elliott*, 181 So. 3d at 271; *Williams*, 921 So. 2d at 1277. Defendant's Motion will be granted as to Plaintiff's design-defect claims, and they will be dismissed with prejudice.

C.     Summary judgment is not appropriate as to Plaintiff's MPLA warnings claims.

Plaintiff's failure-to-warn claims relate to alleged defects in the warnings associated with the Model 16000 crane's counterweight system, and with

conducting tandem lifts using the Model 16000.  Plaintiff asserts that "[a]t no time

has Manitowoc placed warnings on the 16000 crane, in the cab, or in any of the

crane's manuals to warn operators the counterweights could fall off the

counterweight tray, or that the counterweights could strike the crane cab."  3d Am.

Compl. [118] at 4-5.  Plaintiff maintains that

> Manitowoc knew, or in the exercise of reasonable care or reasonably
> available knowledge, should have known, about the unreasonably
> dangerous condition presented by the 16000 "getting light," tipping
> forward, or tipping over, yet it took no steps to warn its owners and/or
> operators of the dangers or of the prior incidents involving 16000
> Series cranes that tipped forward resulting in the counterweights
> striking the cab.

*Id.* at 17.  Plaintiff claims that Defendant failed to warn end users, including Mr.

Williams, of the danger posed by the counterweight system on the Model 16000

crane despite prior alleged tip-overs, including tip-overs of one Model 18000 crane

and two Model 16000 cranes.  *Id.* at 20-21.

Plaintiff has designated Dr. Singhose as an expert on warnings.  Dr.

Singhose opines that Defendant "failed to adequately warn users of the hazards

associated with the machine."  Dr. Singhose's Report [271-1] at 77.  According to Dr.

Singhose,

> Manitowoc failed to warn of two significant hazards of its crane.  First,
> there is absolutely no warning that the counterweights can slide off
> and impact the operator cab.  Second, Manitowoc's warning of the
> hazards that arise from tandem lifts is inadequate and confusing.

*Id.* at 9.  Dr. Singhose contends that the manner in which the Model 16000's

manual and warnings are written is "directed at freely suspended loads."  Dr.

Singhose's 1st Dep. [271-3] at 304. "That assumption goes to all of these warnings, and that doesn't apply to tandem lifts." *Id.*

Dr. Singhose has offered a proposed warning for the falling-counterweight hazard. Dr. Singhose's Rebuttal Report [271-2] at 47. His proposed warning would read "DANGER. CRUSH HAZARD. Falling Counterweights Can Impact Cab." *Id.* Dr. Singhose's proposed warning also contains a visual depiction of a crane tipping forward with a counterweight sliding towards the cab. *Id.* According to Dr. Singhose, this proposed warning comports with the appropriate standard for warning of hazards that can result in death. *Id.*

1.    Warnings claims under the MPLA

For a failure-to-warn claim under the MPLA,

> a plaintiff must show by the preponderance of the evidence that "[t]he product was defective because it failed to contain adequate warnings or instructions," "[t]he defective condition rendered the product unreasonably dangerous to the user or consumer," and "[t]he defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought."

The MPLA provides a manufacturer or seller with a defense to liability in a failure-to-warn claim:

> In any action alleging that a product is defective because it failed to contain adequate warnings or instructions pursuant to paragraph (a)(i)2 of this section, the manufacturer or seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller, the manufacturer or seller knew or in light of reasonably available knowledge should have known about the danger that cause[d] the damage for which recovery is sought and that the ordinary user or consumer would not realize its dangerous condition.

-11-

The MPLA further defines the term "adequate product warning or instruction" as a warning that a reasonably prudent manufacturer or seller would give to an ordinary consumer who purchases the product:

> An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product . . . .

*Elliott*, 181 So. 3d at 273-74 (quoting Miss. Code Ann. §§ 11-1-63(a)(i)(2), (a)(ii), (a)(iii), (c)(i), & (c)(ii)) (emphasis omitted).

2. <u>Genuine issues of material fact preclude summary judgment on Plaintiff's warnings claims.</u>

a. <u>Regardless of whether this is considered a no-warnings case or an inadequate-warnings case, there remains a material fact question on any reliance element of Plaintiff's warnings claims.</u>

The parties dispute whether reliance is an element of Plaintiff's warnings claims in this case. The Mississippi Supreme Court has held that reliance may or may not be an element in an inadequate warnings case. *Mine Safety Appliance Co. v. Holmes*, 171 So. 3d 442, 452 (Miss. 2015). "If the plaintiff argues that a warning not given should have been, reliance is not an element of an inadequate warnings case." *Id.* (quotation omitted). If the plaintiff instead argues that "a given warning was defective, the plaintiff must have read and relied upon the defective warning to complain about it." *Id.* (quotation omitted).

Defendant has presented competent evidence that warnings about crane tippings were included in the Model 16000 crane operator's manual.  *See* Manual Excerpts [271-15] at 1-14.  Some of the warnings directed that one should prevent the crane from tipping[3] and provided examples of what might cause tipping.[4]  Two of the warnings also cautioned that failing to comply with capacity charts and failing to observe the precaution about compensating for wind effects could result in tipping, and that "[d]eath or serious injury to personnel can result."  *See, e.g., id.* at 2, 3.

The parties have not presented any competent summary judgment evidence, however, of a specific warning given for the Model 16000 crane in this case on the subject of the risk of counterweights falling towards or onto the cab during a tip-over, or on the subject of the dangers associated with, or factors to be considered in, conducting tandem lifts.

---

[3]  *See, e.g.,* Manual Excerpts [271-15] at 1 ("Prevent crane from tipping").

[4]  *See, e.g., id.* at 2 ("All operations must be performed with crane level as specified in capacity charts; otherwise crane could tip.  Failing to comply with capacity charts can result in tipping"); *id.* at 3 (cautioning about wind affects on lifted load and boom, warning "TIPPING CRANE HAZARD!," and stating that "[f]ailing to observe this precaution can cause crane to tip"); *id.* at 6 ("Never operate crane with a snow or ice-boom or jib. The extra weight may cause overload or tipping."); *id.* at 6 ("Wind can cause crane to tip . . ."); *id.* at 7 (warning of "Overload Hazard!" and stating that "[e]xceeding radius given in capacity chart can result in tipping . . ."); *id.* at 7 (warning of "Tipping Hazard!" and that "[u]nless otherwise specified on capacity chart, all crane operations must be performed with crane *level* to within one percent of grade in all directions – 1 ft in 100 ft (0.3 m in 30 m); otherwise crane could tip.") (emphasis in original); *id.* at 8 ("Failing to comply with Capacity Chart requirements can result in tipping . . ."); *id.* at 9 ("Tipping Hazard!  Prevent crane from tipping; adhere to any swing limitations given in capacity charts."); *id.* at 10 (providing information regarding traveling operations, warning of "Tipping Hazard!," and stating that "[f]ailing to comply with above specifications can result in tipping."); *id.* at 14 ("Tipping Hazard!  Prevent crane from tipping. Block ends of crawlers, if required per capacity chart, before raising or lowering boom from or to ground.").

In one of the more recent Mississippi Supreme Court cases addressing an MPLA warnings claim, that Court considered allegations that the warning the manufacturer "provided were defective because they failed to warn of risks associated with using the Dustfoe 66 respirator around respirable silica and in humid conditions." *Holmes*, 171 So. 3d at 453. "It [was] undisputed in Holmes's case that the Dustfoe 66 respirator came with instructions." *Id*. A majority of the Court determined that

> [t]he dissent's argument that [the defendant] provided no warning is incorrect. It is clear from the record that a warning was provided. The dissent even quotes from the warning.

*Id*.

According to the dissent,

> [t]he Dustfoe 66 respirator and its accompanying filter contained the following admonition:

> > Approved for protection against the inhalation of dusts that are not significantly more toxic than lead (dispersoids or particulate matter formed by the disintegration of solid materials by such processes as c r u s h i n g ,   g r i n d i n g ,   a n d   a b r a d i n g ), pneumoconoisis-producing mists (liquid dispersoids formed by the disintegration of a liquid by such processes as spray cooling and atomizing), and chromic acid mist as produced in chromium plating.

> The purported warnings incorporated the following caution language: "[t]his respirator removes only dispersoids from the air. It gives no protection against gases, vapors, or insufficiency of oxygen."

*Id.* at 460 (Kitchens, J., dissenting). The dissent posited that "it is clear that Dustfoe 66 users were not put on notice that the respirator's filter could fail in humid climates such as Mississippi's." *Id.*

Ultimately the Mississippi Supreme Court determined that Holmes' claim constituted one for an inadequate warning, not for a failure to warn. "To argue no warning was provided because the warning that was provided lacked certain content is a misreading of our caselaw and is contrary to the confessed proof in the record." *Holmes*, 171 So. 3d at 442.

*Holmes* arguably stands for the proposition that at least one of Plaintiff's warnings claims, the claim relating to the danger of falling counterweights, could constitute an inadequate warning claim, such that showing Mr. Williams' reliance on the warnings of tip-overs would be a required element of that particular claim. *See id.* However, the Court need not resolve this issue at this time. Even if Plaintiff's warnings claims are considered to be ones for inadequate warnings, Plaintiff has presented sufficient evidence to create a fact question on whether Mr. Williams relied upon the warnings given.

Defendant asserts that there "is absolutely no proof that Mr. Williams read the manual, and failed to understand it," which Defendant maintains means that nothing in the manual could have proximately caused Plaintiff's damages. Def.'s Mem. Br. [272] at 24 (citing *Palmer v. Volkswagen of America, Inc.*, 904 So. 2d 1077, 1084 (Miss. 2005)). Plaintiff responds that "Mr. Williams had a copy of the manual

in the cab, and a reasonable inference can be drawn that Mr. Williams read the owner's manual in his cab." Pl.'s Mem. Br. [288] at 28.

Defendant does not seem to dispute that the Model 16000 manual was present inside Mr. Williams' crane cab at the time of the incident. *See* Reply [295] at 7 n.11 ("Plaintiff cannot merely rely on the fact that the operator's manual was in the cab at the time of the accident as proof that Mr. Williams read it."); *see also* David Smith's Dep. [271-19] at 59 (testifying that he had seen Mr. Williams' load charts in his crane cab on a previous date).[5] Defendant's argument goes more to the question of what inference may be properly drawn from this fact. *See* Reply [295] at 7 n.11 ("Nor does Plaintiff's speculation that Mr. Williams must have read the manual 'because it was necessary for operation of the crane' constitute evidence.").

In addition to evidence that the manual was present in Mr. Williams' cab, there is additional evidence from which a jury could reasonably infer that Mr. Williams had in fact read the load charts and/or manual. Defendant attached to its Motion for Summary Judgment the deposition of David Smith [271-19] ("Mr. Smith"). Mr. Smith was operating the other Model 16000 crane that was conducting the tandem lift with Mr. Williams' crane when the tip-over occurred. Mr. Smith testified that a crane operator's job is to be familiar with the manual for

---

[5] Plaintiff's warnings claims appear to relate to both the operator's manual and the capacity or load charts. The parties have not included in the record a complete copy of the manual or load charts for Mr. Williams' crane. It is not entirely clear from the record whether the load charts are considered part of the manul, but based upon the parties' filings, it appears that they may have been located together in one book. *See, e.g.*, Manual Excerpts [271-15] at 1-14 (including "Capacity Chart Information" and "Operator's Manual").

the crane he is operating.  Mr. Smith testified that he had read the manuals for the cranes he operated.  Mr. Smith's Dep. [271-19] at 35-36.  Mr. Smith would expect other crane operators to also have read those manuals and to be familiar with them. *Id.* at 36.

Mr. Smith testified that during the tandem lift in question, because Mr. Williams' load cell was not functioning on his crane, Mr. Smith had to relay to Mr. Williams information about "how much weight [he] currently had" during the lift, so that Mr. Williams could "adjust[ ] his crane, like we say, old school, to compensate for the weight."  *Id.* at 46.  Mr. Smith explained that "old school" means using the printed load charts, rather than the crane computer.  *Id.* at 39.  Julius Williams,[6] who was Mr. Williams' supervisor, also explained that if the load moment indicator ("LMI") stops working on a crane, the crane operator could refer to the load charts instead.  Julius Williams' Dep. [271-17] at 17, 154, 156-57.  Julius expected all of the crane operators, including Mr. Williams, to be familiar with the operator's manual and the capacity charts in that manual because each operator was assigned to a particular crane.  *Id.* at 143-144.

Defendant also submitted the deposition testimony of Harold Abbott ("Mr. Abbott"), another crane operator at VTHM.  Mr. Abbott's Dep. [271-18] at 8-9.  Mr. Abbott testified that Mr. Williams was a certified crane operator with the National Commission for the Certification of Crane Operators ("NCCCO").  *Id.* at 13-14.  As

---

[6]  The Court will refer to Julius Williams by his full name or by "Julius" in order to avoid confusion with his and Mr. Williams' common surname.

part of obtaining this certification, Mr. Abbott and Mr. Williams were tested on how to select and use the correct load charts for the crane they were operating. *Id.* at 14. According to Julius, Mr. Williams had been operating the Model 16000 crane since Mr. Williams began working at the VTHM shipyard. Julius Williams' Dep. [271-17] at 143.

Julius described Mr. Williams as "one of the safest [crane operators he] had" at the shipyard. *Id.* at 17. According to Julius, Mr. Williams "always wants to make sure that what we're doing, we're doing it the right way. He don't [sic] like to take no [sic] chances." *Id.* at 18. Mr. Smith also reported that Mr. Williams was very cautious, particularly with performing a daily inspection on his crane. Mr. Smith's Dep. [271-19] at 53.

In the Court's view, based upon the foregoing, there is sufficient probative summary judgment evidence in the record from which a jury could reasonably infer that Mr. Williams read and relied upon the applicable warnings in the load charts and/or manual. To the extent that either or both of Plaintiff's warnings claims could be characterized as no-warnings claims, reliance by Mr. Williams would not be a necessary part of Plaintiff's proof. In any event, based upon the competent summary judgment evidence, Defendant has not met its burden of demonstrating that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law based upon any purported lack of reliance by Mr. Williams on the warnings that were given. *See* Fed. R. Civ. P. 56(a).

b.     The Court is not persuaded that Defendant's remaining arguments as to proximate causation warrant granting summary judgment given the record before the Court.

Defendant maintains that Plaintiff cannot show that any defective warnings proximately caused her damages.  Under the MPLA, a plaintiff must show, among other things, that "[t]he defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought."  *Elliott*, 181 So. 3d at 273 (quoting Miss. Code Ann. § 11-1-63(a)(iii)).

"Proximate cause" itself is not defined by the MPLA.  In premises-liability cases, the Mississippi Supreme Court has defined "proximate cause . . . as the 'cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury and without which the result would not have occurred.'"  *Cade v. Beard*, 130 So. 3d 77, 85 n.7 (Miss. 2014) (quoting *Double Quick, Inc. v. Moore*, 73 So. 3d 1162, 1166 (Miss. 2011)).  "Proximate cause is a concept which is more accurately defined by reference to the distinct concepts of which it is comprised, which are:  (1) cause in fact; and (2) foreseeability."  *Davis v. Christian Bhd. Homes of Jackson, Miss., Inc.*, 957 So. 2d 390, 404 (Miss. Ct. App. 2007) (quotation omitted).

> Cause in fact means that the act or omission was a substantial factor in bringing about the injury, and without it the harm would not have occurred. Foreseeability means that a person of ordinary intelligence should have anticipated the dangers that his negligent act created for others.

*Id.* (quotation omitted).

In an MPLA case, the Mississippi Supreme Court has explained that

> "[t]he defendant's wrongful conduct must be a cause in fact of plaintiff's injury before there is any liability." [*Jackson v. Swinney*, 140 So. 2d 555, 557 (Miss. 1962).] The plaintiff bears the burden of proof, in a product liability suit, to prove by a preponderance of the evidence that the product which caused the alleged injuries suffered from a defect "at the time the product left the control of the manufacturer or seller . . . ." Miss. Code Ann. § 11-1-63(a) (Rev. 2002).

*Miss. Valley Silica Co. v. Reeves*, 141 So. 3d 377, 382 (Miss. 2014); *see also Rowan v. Kia Motors Am., Inc.*, 16 So. 3d 62, 66 (Miss. Ct. App. 2009). "A mere possibility of such causation is not enough." *Rowan*, 16 So. 3d at 66 (quoting *Herrington v. Leaf River Forest Prods., Inc.*, 733 So. 2d 774, 777 (Miss. 1999)). Where a plaintiff has never read or relied upon the warnings a defendant has provided with the product, the plaintiff cannot show proximate cause sufficient to establish a warnings claims under the MPLA. *Holmes*, 171 So. 3d at 457.

(1)  <u>Defendant has not shown that Dr. Singhose's testimony establishes lack of proximate causation sufficient to warrant dismissal of Plaintiff's warnings claims.</u>

Defendant asserts that Dr. Singhose's testimony that the crane would still be defective even after his proposed warning was given indicates that "the proximate cause of the injury was something else    and not the failure to warn." Def.'s Mem. Br. [272] at 22-23. According to Defendant, "[t]his admission alone subjects Plaintiff's failure to warn claims to dismissal as a matter of law." *Id.* Defendant cites no legal authority in support of this argument.

Dr. Singhose was asked "if I put this warning [about falling counterweights] on the Manitowoc 16000, is it no longer defective and unreasonably dangerous in your mind?" Dr. Singhose's 2d Dep. [271-4] at 263. Dr. Singhose responded as follows:

> I think that it's still defective and unreasonably dangerous, but the degree to which it's dangerous is less. There's always degrees to all of this stuff. I think that placard helps make the machine a little bit less dangerous.

*Id.* at 263-64.

The Court is not persuaded that Dr. Singhose's response to this hypothetical question about the danger of operating a Model 16000 crane even with his proposed warning incorporated would automatically preclude a jury from finding that the lack or inadequacy of warnings given was the proximate cause of Mr. Williams' tip-over accident. The Court concludes that Dr. Singhose's deposition testimony does not mandate summary judgment in Defendant's favor.

(2)    Defendant has not shown the absence of a material fact question on whether the manual warned against the specific danger which caused Plaintiff's damages.

Defendant contends that the "manual contained dozens of separate warnings regarding the tipover of the crane." Def.'s Mem. Br. [272] at 23. "If the crane operator heeds these warnings and does not tip the crane over, there is no danger that the counterweights will become dislodged, and there will be no danger from falling counterweights." *Id.* Defendant maintains that "the warning is not inadequate or defective at all if the operator's manual warned against the 'specific

risk of injury' which occurred." *Id.* (citing *Previto v. Ryobi N. Am.*, No. 1:08cv177-HSO-JMR, 2011 WL 135673 (S.D. Miss. Jan. 14, 2011); *McSwain v. Sunrise Med., Inc.*, 689 F. Supp. 2d 835 (S.D. Miss. 2010)).

Plaintiff responds that, even though the Model 16000 crane is "designed for use in tandem lifts[,] [t]he load charts and other load calibrating equipment Manitowoc provides with the [M]odel 16000 crane are inapplicable to tandem lifts, during which one crane constantly exerts forces on the other." Pl.'s Mem. Br. [288] at 2 (footnote omitted).

> The [Model 16000] manual contained various charts which were necessary to consult for boom angles and load weights on single load lifts. Nothing in the manual references tandem lifts, which is how the crane was pulled over. Nothing in the manual references unsecured counterweights hitting the cab. With his current mental incapacity, Mr. Williams is not able to comment on this issue.

*Id.* at 28.

*Previto* and *McSwain*, the two cases cited by Defendant, are distinguishable from this case. In *Previto*, the manual contained a specific warning about the need to wear proper eye protection, including a warning cautioning that "operati[ng] any power tool can result in foreign objects being thrown into your eyes, which can result in severe eye damage." *Previto*, 2011 WL 135673, at *5-*6. The plaintiff brought claims "for injuries he sustained when the carbide tip of a power table saw he was using allegedly separated from the saw and struck him in his eye." *Id.* at *1. The Court found that "the warnings provided adequately advised Plaintiff of the danger of the very injury of which he now complains." *Id.* at *6.

*McSwain* involved a plaintiff who tipped over backwards in a wheelchair. *McSwain*, 689 F. Supp. 2d at 838. The warnings manual for the wheelchair "specifically warned of the dangers of rear tip over when operating a new wheel chair or attempting to do a wheelie . . . ." *Id.* at 844. This Court concluded that "the warning was adequate because it warned of the specific risk of injury that McSwain complains occurred." *Id.*

In this case, the Model 16000 crane manual's warnings of the dangers associated with tip-overs which are included in the summary judgment record do not appear to be as specific as those at issue in *Previto* and *McSwain*. *See* Manual Excerpts [271-15] at 1-14. The warnings in the record arguably do not explicitly warn of the dangers of which Plaintiff now complains, falling counterweights if there is a tip-over, and the dangers associated with tandem lifts. Defendant has not shown the absence of a material fact question on whether the Model 16000 manual warned against the specific danger or risk of injury in this case. Summary judgment on this basis would not be appropriate.

(3)    There is a material fact question as to whether Plaintiff's proposed warnings are obvious and already known by crane operators.

Defendant maintains that "the warnings which Dr. Singhose proposes are perfectly obvious, and already known by experienced crane operators involved in this accident." Def.'s Mem. Br. [272] at 24. Defendant points to the deposition of Julius Williams in an effort to demonstrate that Julius "already knew the increased risk that must be planned for when performing tandem lifts." *Id.* at 24-25 (citing

Julius Williams' Dep. [272-17] at 182-83, 195-98).  Defendant also references Mr. Smith's deposition testimony that he would have no issue operating another Model 16000 crane after Mr. Williams' accident.  *Id.* at 25 (citing Mr. Smith's Dep. [271-19] at 174).  Plaintiff responds that "[t]he ordinary user or consumer would assume that the counterweight boxes on the 16000 remain secured in the event a crane gets light."  Pl.'s Mem. Br. [288] at 26.

The Court is not persuaded that either Julius Williams' or Mr. Smith's deposition testimony establishes beyond dispute that the dangers Plaintiff argues existed with respect to falling counterweights and conducting tandem lifts were obvious and known by crane operators before Mr. Williams' accident.  As for Julius Williams' testimony, Defendant has not adequately shown that his testimony about posting men on the ground to observe whether the crane's lines are plumb during tandem lifts necessarily means that the alleged dangers raised by Plaintiff were obvious and known to crane operators.  These dangers included the safe load capacity during a tandem lift[7] or the possibility that counterweights may fall off the counterweight tray towards the cab during a tip-over event.

---

[7] For example, Dr. Singhose opines that the "best load chart provided by Manitowoc for [Mr. Williams'] particular crane configuration and application . . . does not accurately reflect the tip-over moment generated by the additional 70-ft jib."  Dr. Singhose's Report [271-1] at 27.  According to Dr. Singhose, Defendant's direction "to simply subtract off approximately 38,000 lbs from the capacity listed in the chart" is simplistic, and "the compensated load chart is not an accurate representation of the tip-over properties of the crane when the 70 ft. jib is attached."  *Id.* at 27-28.  Dr. Singhose also notes that the capacity charts employ the total weight of freely suspended loads, but "when the crane is engaged in a tandem (or multi-crane) lift, it is not possible to have a "[f]reely suspended load" because the other crane or cranes always apply a "direct external force."  *Id.* at 65.  Dr. Singhose concludes that Defendant "has not provided load charts that are applicable to tandem lifts."  *Id.*

The questions posed to Mr. Smith were based upon his knowledge at the time of the deposition, which occurred after Mr. Williams' accident. The Court does not read Mr. Smith's testimony as reflecting what he or any other crane operator knew at the time of Mr. Williams' tip-over.

Julius Williams testified that he had "really never thought about" whether the counterweights were secured. Julius Williams' Dep. [271-17] at 188. Mr. Abbott, a VTHM crane operator, was asked whether he knew if there were other cranes at VTHM that had counterweights without pins or chains. Mr. Abbott's Dep. [271-18] at 65. Mr. Abbott testified that, before Mr. Williams' accident, he had "never really thought about it." *Id.* at 66. "Then, [he] figured they all need it somehow or another." *Id.*

According to Dr. Singhose, "[t]he phrase 'moveable counterweights' is not intended to describe counterweights that shift or fall off the crane unexpectedly." Dr. Singhose's Report [271-1] at 14. Mr. Smith was asked during his deposition about securing counterweights. Mr. Smith testified "they're so heavy, they're not just going to fall off." Mr. Smith's Dep. [271-19] at 152. Mr. Smith also testified that he had never before seen counterweights come off of a crane. *Id.* at 153. Even though Mr. Smith testified that he sees "absolutely no problem with the way the counterweights were sitting there," *id.* at 154, a jury considering Mr. Smith's testimony in its entirety could infer that a crane operator at the time of Mr. Williams' incident would not have known that the counterweights could slide off the counterweight stack during a tip-over.

Moreover, during the Rule 30(b)(6) deposition of Defendant's corporate representative Alan Calta ("Mr. Calta"), Mr. Calta testified that Defendant did not know that counterweights could strike the cab of the Model 16000 crane when it tipped over. Mr. Calta's Dep. [239-2] at 60-61.[8] If this is Defendant's position, it seems inconsistent to argue that Mr. Williams or the average crane operator should or could have known of a danger the manufacturer itself claims it did not foresee. Nor has Defendant pointed to any competent summary judgment evidence showing how a crane operator would know what effect a tandem lift would have on the capacity of the crane as shown on the load charts, or how a tandem lift might negate the applicability of the load charts.

Based upon the record as a whole, Defendant has not shown the absence of a genuine question of material fact as to whether the dangers alleged by Plaintiff were known or obvious at the time of Mr. Williams' accident. Defendant has not shown that it is entitled to judgment as a matter of law on Plaintiff's warnings claims.

(4)     There is a material fact question as to whether Mr. Williams would have done anything differently had he been specifically warned of the dangers of counterweights falling and conducting tandem lifts.

Defendant contends that "there is also no proof that Mr. Williams would have done anything differently had he been specifically warned, for example, that counterweights could hit the cab in the event of a tipover." Def.'s Mem. Br. [272] at

---

[8] The transcript of Mr. Calta's deposition testimony was submitted by Defendant in support of a previous Motion for Summary Judgment [179].

25.  According to Defendant, "Mr. Williams' goal, and the goal of every other crane operator, was to prevent the crane from tipping over in the first place."  *Id.* Therefore, "adding 'warnings' about what other catastrophic consequences from a tipover [could occur] will not cause them to act any differently."  *Id.* at 26.

In response, Plaintiff refers to a letter [287-20] from Douglas W. Stockwell ("Mr. Stockwell"), the Business Manager for the International Union of Operating Engineers Local 324.  Pl.'s Mem. Br. [288] at 26 (citing Stockwell's Letter [287-20]).[9] According to Plaintiff, this letter "provides concrete, real-life examples of how a warning providing knowledge of the falling counterweights would make a difference" because it shows how other Model 16000 crane owners "have created their own temporary alternative design of wrapping chains around the counterweights."  *Id.*

Even without considering the substance of this letter, which is the subject of a separate pending Motion *in Limine* [300], the Court finds that a fact question exists which precludes summary judgment.  In its Reply, Defendant relies upon excerpts from Mr. Stockwell's deposition [295-1].  In response to an earlier Motion for Summary Judgment [179], Plaintiff presented additional portions of Mr. Stockwell's deposition which indicated that companies operating other Model 16000 cranes had retrofitted the cranes with some type of counterweight restraint system to prevent counterweights from falling during tipping.  *See, e.g.,* Dep. of Douglas

---

[9]  The Court recognizes that this letter is the subject of a separate Motion *in Limine* [300], which remains pending before the Court.

Stockwell [224-28] at 102-03; *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). Based upon the foregoing, the Court concludes that there is probative evidence in the record from which a jury could infer that Mr. Williams would have acted differently if the warning proposed by Plaintiff about falling counterweights had been given prior to his accident.

Defendant does not appear to make this same reliance argument as to the capacity of load charts or other warnings related to conducting tandem lifts. To the extent Defendant does so, the Court finds that the record contains sufficient evidence for a jury to infer that Mr. Williams would have relied upon any additional warnings on these subjects as well. As Mr. Smith testified, Mr. Williams had to adjust his Model 16000 crane "old school" during the tandem lift, which meant that he would have needed to rely upon the load charts. *See* Mr. Smith's Dep. [271-19] at 39, 46.

In sum, Defendant has not carried its burden of demonstrating that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law on Plaintiffs' MPLA defective warnings claims. *See* Fed. R. Civ. P. 56(a). Defendant's Motion for Summary Judgment will be denied in part as to these claims.

### III. <u>CONCLUSION</u>

To the extent the Court has not addressed any of the parties' arguments, it has considered them and determined that they would not alter the result. The

Court concludes that Defendant's Motion for Summary Judgment should be granted in part and denied in part.[10]  Plaintiff's design-defect claims will be dismissed with prejudice, and Plaintiff's warnings claims will proceed.  Plaintiff's loss-of-consortium claim, which was not addressed in this Order, will also proceed.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that the Motion for Summary Judgment [271] filed by Defendant Manitowoc Cranes, LLC, is **GRANTED IN PART**, as to Plaintiff's design-defect claims, and **DENIED IN PART**, as to Plaintiff's warnings claims.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that Plaintiff's design-defect claims in this case are **DISMISSED WITH PREJUDICE**.

**SO ORDERED AND ADJUDGED**, this the 30th day of September, 2016.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE

---

[10]  The Court could have denied Defendant's Motion strictly for failing to comply with the Local Rules.  Excluding the Certificate of Service, Defendant's Motion [271] was over five pages long and contained legal argument and citations to case law.  Def.'s Mot. [271] at 1-5.  This contravened Local Uniform Civil Rule 7(b)(2)(B), which provides that "a motion may not exceed four pages, excluding exhibits, may contain only the grounds for the request and may not contain legal argument or citations to case law or other secondary authority."  L.U. Civ. R. 7(b)(2)(B).  Counsel is reminded to comply with this Rule in the future.

In addition, in support of its Motion [271], Defendant attached 23 exhibits totaling 3,511 pages.  Throughout its Memorandum [272], Defendant only refers to these exhibits by name, not by exhibit number, resulting in the Court consuming valuable judicial time and resources searching for the correct exhibit.  Counsel is reminded to avoid this practice and use exhibit numbers when referencing exhibits in future pleadings and at trial.